# Exhibit B

# PIPER'S ALLEY

## SPACE LEASE

### BETWEEN

### OLD TOWN DEVELOPMENT ASSOCIATES, L.L.C.

### LANDLORD

### AND

### THE SECOND CITY, INC.

### TENANT

## TABLE OF CONTENTS

Section 1.      Lease of Premises. ...............................................................................2
  Section 1.1   Lease of the Premises ...........................................................2
  Section 1.2   Term ......................................................................................3
  Section 1.3   Common Area .......................................................................5
Section 2.      Construction of the Premises. .................................................6
  Section 2.1   Landlord's Work. ..................................................................6
  Section 2.2   Tenant's Work. ......................................................................6
  Section 2.3   Tenant's Plans. ......................................................................6
  Section 2.4   Intentionally omitted. ...........................................................7
  Section 2.5   Construction of Landlord's Work ........................................7
  Section 2.6   Proof of Completion of Tenant's Work. ...............................8
  Section 2.7   Compliance with Exhibits C and D. .....................................8
Section 3.      Rent. .......................................................................................8
  Section 3.1   Base Rent. ..............................................................................8
  Section 3.2   Percentage Rent. ....................................................................8
  Section 3.3   Additional Rent. .....................................................................8
  Section 3.4   All Amounts Constitute Rent. ..............................................12
  Section 3.5   Late Charges. ........................................................................12
  Section 3.6   Independent Covenant. .........................................................12
  Section 3.7   Under/Over Payments by Tenant. ........................................12
  Section 3.8   Disputes. ...............................................................................13
Section 4.      Security Deposit. ...................................................................13
Section 5.      Advertising and Promotion. ..................................................14
  Section 5.1   Intentionally omitted. ...........................................................14
  Section 5.2   Intentionally omitted ............................................................14
  Section 5.3   Intentionally omitted. ...........................................................14
  Section 5.4   Merchants' Association. ........................................................14
Section 6.      Use. ........................................................................................14
  Section 6.1   Use of the Premises ..............................................................14
  Section 6.2   Use of Common Areas. .........................................................15
Section 7.      Landlord's Repair Obligations. .............................................15
Section 8.      Utilities and Other Services. .................................................15
  Section 8.1   Electricity and Gas. ..............................................................15
  Section 8.2   Telephone. .............................................................................15
  Section 8.3   Heating, Ventilating and Air Conditioning. .........................16
  Section 8.4   Water and Sewer. ..................................................................16
  Section 8.5   Other or Increased Services. ................................................16
  Section 8.6   Cleaning. ...............................................................................16
  Section 8.7   Lighting. ................................................................................17
  Section 8.8   Interruptions. ........................................................................17
Section 9.      Insurance. ..............................................................................17
  Section 9.1   Coverages. .............................................................................17
  Section 9.2   Form of Insurance. ...............................................................18
  Section 9.3   Mutual Waiver of Right of Recovery ...................................18

Section 9.4     Waiver of Landlord's Liability ................................................19
Section 10.     Signs and Decorations.........................................................19
Section 10.1    Exterior Signs ...............................................................19
Section 10.2    Exterior Window Treatments.....................................................20
Section 10.3    Interior Signs................................................................20
Section 10.4    Decorations...................................................................20
Section 10.5    Special Provisions Applicable to Tenant.......................................20
Section 11.     Tenant's Further Obligations..................................................20
Section 11.1    Affirmative Covenants.........................................................20
Section 11.2    Negative Covenants............................................................25
Section 12.     Rights Reserved to Landlord. .................................................28
Section 12.1    Name and Address..............................................................28
Section 12.2    Signs. .......................................................................28
Section 12.3    Keys. ........................................................................28
Section 12.4    Reletting ....................................................................28
Section 12.5    Access .......................................................................28
Section 12.6    Heavy Objects.................................................................28
Section 12.7    Repairs and Alterations.......................................................28
Section 12.8    Additions.....................................................................29
Section 12.9    Erection of Scaffolds ........................................................29
Section 12.10   Exclusives....................................................................29
Section 12.11   Remeasurement.................................................................29
Section 13.     Casualty Damage...............................................................29
Section 13.1    Damage by Fire or Other Casualty. ............................................29
Section 13.2    Right to Terminate Lease due to Casualty Damage. .............................29
Section 13.3    Commencement of Restoration. .................................................30
Section 13.4    Abatement of Rent for Untenantability ........................................30
Section 13.5    Insurance Proceeds............................................................30
Section 14.     Eminent Domain. ..............................................................30
Section 14.1    Substantial Taking. ..........................................................30
Section 14.2    Other Taking .................................................................31
Section 14.3    Taking During Last Two Years of Term .........................................31
Section 14.4    Taking of Possession .........................................................31
Section 14.5    Notice of Pending Proceeding. ................................................32
Section 14.6    Ownership of Award ...........................................................32
Section 15.     Force Majeure. ...............................................................32
Section 16.     Defaults by Tenant; Landlord's Remedies. .....................................32
Section 16.1    Tenant's Defaults. ...........................................................32
Section 16.2    Payment of Damages...........................................................33
Section 16.3    Repossession of Premises by Landlord. ........................................33
Section 16.4    Removal of Tenant's Property; Reletting.......................................34
Section 16.5    Disposal of Tenant's Property.................................................34
Section 16.6    Reimbursement of Landlord's Costs ............................................34
Section 16.7    Intentionally omitted. .......................................................35
Section 16.8    Holdover by Tenant. ..........................................................35
Section 16.9    Landlord's Right to Cure Tenant's Defaults....................................35

ii

Section 16.10    Non-Waiver by Landlord ...................................................35
Section 17.    Subletting and Assignment; Changes in Control of Tenant ...............35
Section 17.1    Subletting by Tenant.............................................................35
Section 17.2    Landlord's Right to Recapture.................................................36
Section 17.3    Consent Not a Release of Tenant..............................................36
Section 17.4    Transfer Without Consent Ineffective as to Landlord. ..................37
Section 17.5    Landlord's Right to Assign ....................................................37
Section 17.6    Change in Control of Tenant ...................................................37
Section 17.7    Acceptance of Payment Not Consent ........................................37
Section 17.8    Landlord's Costs. ................................................................38
Section 18.    Quiet Enjoyment. ................................................................38
Section 19.    Estoppel Certificate. ............................................................38
Section 20.    Subordination. ....................................................................38
Section 21.    Attornment. .......................................................................38
Section 22.    Notices. .............................................................................39
Section 22.1    Notices to Landlord..............................................................39
Section 22.2    Notices to Tenant.................................................................40
Section 22.3    Effectiveness of Mailed Notices...............................................40
Section 22.4    Copies of Notices to Lenders ..................................................40
Section 23.    Landlord's Defaults; Lender's Right to Cure. ...........................40
Section 23.1    Default Defined, Notice. ........................................................40
Section 23.2    Notice to First Mortgagee......................................................40
Section 24.    Execution. ..........................................................................40
Section 24.1    Submission of Lease..............................................................40
Section 24.2    Entire Agreement.................................................................40
Section 24.3    Authority of Parties Executing the Lease ...................................41
Section 24.4    Joint and Several Liability. .....................................................41
Section 25.    Miscellaneous......................................................................41
Section 25.1    Receipt of Money after Termination of Lease..............................41
Section 25.2    Time of the Essence..............................................................41
Section 25.3    Captions. ...........................................................................42
Section 25.4    Counterparts .......................................................................42
Section 25.5    Brokers. .............................................................................42
Section 25.6    Relationship of Landlord and Tenant........................................42
Section 25.7    No Personal Liability.............................................................42
Section 25.8    Relocation. .........................................................................42
Section 25.9    Intentionally omitted. ............................................................43
Section 25.10    Intentionally omitted. ..........................................................44
Section 25.11    Fourth Floor Kiosk ..............................................................44
Section 25.12    Entrance Archways..............................................................44
Section 26.    Successors. .........................................................................44
Section 27.    Jury Waiver. .......................................................................44
Section 28.    Hazardous Materials. ...........................................................44
Section 28.1    Limitations on Use ...............................................................44
Section 28.2    Notices Regarding Hazardous Material......................................45
Section 28.3    Remediation........................................................................45

iii

Section 29.  Termination of Previous Leases. ........................................................................46
Section 30.  Press Releases. ...................................................................................................46

130007072v6 0912315 73489

## SPACE LEASE

Lease made in Chicago, Illinois as of the 1st day of January, 2011 (the "**Commencement Date**").

The following Schedule sets forth basic information and definitions concerning this Lease, and is hereby made a part hereof:

### Schedule

| | | |
|---|---|---|
| (a) | Landlord: | Old-Town Development Associates, L.L.C., an Illinois limited liability company |
| (b) | Landlord's Agent: | Thomas M. Tully<br>c/o Thomas M. Tully & Associates<br>33 N. Dearborn Street<br>Suite 2450<br>Chicago, Illinois 60602 |
| (c) | Tenant: | The Second City, Inc., an Illinois corporation |
| (d) | Tenant's Trade Name: | Second City |
| (e) | Building: | Piper's Alley<br>210-230 West North Avenue<br>Chicago, Illinois 60610 |

(f)     Premises: Space: (i) first floor entry/ticket booth area on Wells Street (the "**First Floor Space**"), (ii) second and third floor offices (the "**Office Space**"), (iii) main stage theatre, lobby and support area (the "**Theatre Space**"), (iv) ETC theater and lobby (the "**ETC Space**"), (v) fourth floor stage/sky box (the "**Training Stage Space**")(collectively, the First Floor Space, Office Space, Theatre Space, ETC Space and Training Stage Space contain approximately 22,070 rentable square feet), (vi) Additional Space on 4th Floor containing approximately 4,835 rentable square feet (the "**2001 Addition**"), (vii) units 3NE and 4NE containing approximately 9,300 rentable square feet (the "**Black Orchid Space**"), (viii) unit R 300 containing approximately 8,487 rentable square feet (the "**Tony n' Tina Space**"), and (ix) 4th floor coat room located adjacent to the Tony n' Tina Space containing approximately 554 rentable square feet (the "**Coat Room Space**"), each as depicted on **Exhibit A-1** attached hereto and made a part hereof.

(g)     Net Rentable Square Feet in Premises: Approximately 45,246 square feet.

(h)     Main Term:  The period of time from the Commencement Date until December 31, 2025.

Extension:  Three (3) periods of five (5) years each.

Term:  The Main Term, together with all exercised Extensions.

130007072v6 0912315 73489

(i)     Rent Commencement Date:

- For all spaces in the Premises *except* the Tony n' Tina Space: the Commencement Date

- With respect to the Tony n' Tina Space: The *earlier* of (1) six months following the issuance of a building permit by the City of Chicago, (2) the date which Tenant opens for business in the Tony n' Tina Space, and (3) October 1, 2011. Notwithstanding the foregoing, if a force majeure event (as delineated in Section 15 hereof) occurs which prevents Tenant from completing its work in the Tony n' Tina Space by October 1, 2011 and Tenant does not open for business in said space, then for each day of such force majeure event, the Rent Commencement Date as it relates to the Tony n' Tina Space shall be extended beyond October 1, 2011 by one day. Tenant shall use commercially reasonable efforts to submit its application for a building permit and plans to the City of Chicago within 3 business days after the Landlord approves the Final Plans.

Expiration Date: December 31, 2025

(j)     Permitted Use:  A cabaret theater operation, stand-up comedy, tavern with limited restaurant services, offices, training center and sales of Second City memorabilia and related items, as well as related office, storage, rehearsal, backstage, film and television operations.

(k)     Base Rent: As shown on **Exhibit A-2**.

(1)     Tenant's Proportionate Share of Operating Expenses and Taxes: 33.44%
(m)     Percentage Rent Rate:        None.
(n)     Gross Sales Breakpoint:       Not applicable.
(o)     Monthly Promotional Contribution: None.
(p)     Security Deposit: $58,442.75
(q)     Tenant's Address For Notices Prior to Commencement Date:
                        The Second City, Inc.
                        c/o Andrew Alexander
                        1616 North Wells Street
                        Chicago, Illinois 60614
(r)     Date for Completion of Tenant's Work:  Not applicable.
(s)     Date for Submission of Tenant's Preliminary Plans: January 31, 2011.
(t)     Guarantor:  None.
(u)     Guarantor's Address:  Not applicable.
(w)     Landlord's Contribution to Tenant's Work:  None.

In the event of a conflict between the provisions of this Schedule and the Lease, the Lease shall control.

**Section 1.     Lease of Premises.**

**Section 1.1     Lease of the Premises**. Landlord, as the owner of a commercial building commonly known as Piper's Alley (the **"Building"**) situated on real estate (the "**Real Estate**") located at 210-230 West North Avenue, Chicago, Illinois 60610 described as follows:

2

PARCEL 1:

SUB-LOTS 1 TO 5, BOTH INCLUSIVE, (EXCEPT THE SOUTH 25 FEET OF SAID SUB-LOT 5) AND SUB-LOTS 6 TO 13, BOTH INCLUSIVE (EXCEPT THE SOUTH 34.0 FEET OF SAID SUB-LOTS 6 TO 13, BOTH INCLUSIVE) ALL BEING IN ASSESSOR'S DIVISION OF LOTS 23, 24 AND 25 IN GALES NORTH ADDITION TO CHICAGO, IN THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 33, TOWNSHIP 40 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS

PARCEL 2:

LOTS 1 TO 5, BOTH INCLUSIVE (EXCEPT THE SOUTH 34 FEET THEREOF) AND LOTS 6 TO 9, BOTH INCLUSIVE, AND ALL OF THE ALLEY LYING SOUTH OF AND ADJOINING THE SOUTH LINE OF SAID LOT 6 AND ALL OF THE ALLEY LYING EAST OF AND ADJOINING THE EAST LINE OF SAID LOTS 6 TO 9 AND EAST OF THE EAST LINE OF LOT 6 EXTENDED SOUTH TO THE SOUTH LINE OF EAST WEST ALLEY SOUTH OF AND ADJOINING SAID LOT 6 ALL IN JOHN HENRICH'S SUBDIVISION OF LOTS 14, 15, 16 AND 17 IN THE ASSESSOR'S DIVISION OF LOTS 23, 24 AND 25 IN NORTH ADDITION TO CHICAGO, IN THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 33, TOWNSHIP 40 NORTH RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS

(the Building and the Real Estate being collectively referred to as the "**Property**"), does hereby lease to Tenant, and Tenant hereby accepts the lease of, the space in the Building shown on the Floor Plan attached hereto as **Exhibit A-1** (the "**Premises**"), extending to the exterior face of all exterior walls, to the exterior faces of all interior walls (including store-fronts), to the demising line where there is no wall or to the center line of those walls separating the Premises from other premises, but reserving and excepting to Landlord the use of the exterior walls and the roof and the right to install, maintain, use, remove, repair and replace pipes, ducts, conduits, wires, cables and other facilities in the floor, walls, ceiling and other portions of the Premises (and access panels thereto) to serve other portions of the Building and the Property, provided that any such installations and Landlord's access thereto in the Premises will be in and from locations which will not materially interfere with Tenant's Permitted Uses thereof as set forth in the Schedule.

**Section 1.2    Term.**

    **1.2.1    Preliminary Term.** Intentionally omitted.

      **1.2.2**   **Main Term**. The Main Term of this Lease shall commence on the Commencement Date and expire on the Expiration Date.

      **1.2.3**   **Lease Year.** For the purposes of this Lease, "**Lease Year**" shall mean a consecutive twelve-month period commencing January 1 and ending December 31, both inclusive, during which any portion of the Term falls. Any portion of the Term which is less than a Lease Year shall be deemed a "**Partial Lease Year**."

      **1.2.4**   **Intentionally omitted**.

      **1.2.5**   **Extension**. Provided Tenant is not in default under this Lease and is in possession of the Premises, Tenant shall have the option of extending the Main Term for three (3) additional periods of five (5) years each (each five years, an "**Extension**"), commencing at midnight on the date on which the Main Term or the previous Extension, as the case may be, expires. The parties shall be bound by this Lease for such Extension in the event Tenant gives Landlord notice, not later than one hundred eighty (180) days prior to the expiration of the Main Term or the applicable Extension, as the case may be, that Tenant intends to extend the Lease. During each Extension, Tenant shall have the right to occupy the Premises on the same terms and conditions as set forth in this Lease; provided, however, the Base Rent during the first twelve (12) months of the second and third Extension shall be the Market Rent (hereafter defined). The determination of fair market rent ("**Market Rent**") for the Premises shall be made no later than the date that is one hundred twenty (120) days prior to commencement of the second and third Extension, as applicable. The Market Rent for the Premises shall be determined by mutual agreement of Landlord and Tenant. In the event that Landlord and Tenant fail to agree on or before the date which is one hundred twenty (120) days prior to the commencement of the applicable Extension, the Market Rent of the Premises for the first twelve months of the applicable Extension shall be determined by appraisal in the manner set forth hereof. Any determination by appraisal or any agreement reached by the parties hereto with respect to such Market Rent for the Premises for the first twelve months of the applicable Extension shall be expressed in writing and shall be executed by the parties hereto, and a copy thereof delivered to each of the parties. Within seven (7) days after the expiration of the period within which Landlord and Tenant were to reach agreement on the Market Rent as provided herein, Landlord and Tenant shall mutually appoint an appraiser that has at least five (5) years full-time commercial appraisal experience and is a member of the American Institute of Real Estate Appraisers. If Landlord and Tenant are unable to agree upon an appraiser, either of the parties to this Lease, after giving two (2) days prior written notice to the other party, may apply to the then president of the Chicago Board of Realtors for the selection of an appraiser who meets the foregoing membership qualifications, which selection shall be made within ten (10) days. The appraiser selected by the president of the Board of Realtors shall also be a person who has not previously acted in any capacity for either party, its affiliates or leasing agents and who meets the above experience qualifications. Landlord and Tenant shall each, within seven (7) days of the appointment (either by agreement or selection) of the appraiser, submit to the appraiser such parties' proposal for the Market Rent for purposes of this section. Within ten (10) days after the conclusion of the above-referenced seven-day period, the appraiser shall review each of Landlord's and Tenant's submittals and shall review such other information as such appraiser shall deem necessary (a party may furnish the appraiser with any information it deems relevant) and shall determine which of the two submittals is the more reasonable. The appraiser shall

immediately notify the parties of his or her selection, and such selection shall be the Market Rent of the Premises for the first twelve (12) months of the applicable Extension. If, upon the expiration of the above-referenced seven-day period, the appraiser shall have received one of the party's submittals as to the Market Rent, but not both, the appraiser shall designate the submitted item as the Base Rent for the first twelve (12) months of the applicable Extension, and the appraiser shall immediately notify the parties of the same. Landlord and Tenant agree that the Base Rent (as determined pursuant to this Section 1.2.5) for the second (2nd) through fifth (5th) years of each of the second and third Extension shall increase at the rate of three percent (3%) per annum.

Section 1.3    Common Area. Landlord shall make available from time to time such areas and facilities on the Property of non-exclusive general or limited common use and/or benefit to the tenants and occupants of the Building as Landlord shall in Landlord's sole discretion deem appropriate (herein referred to as the "common areas"). Such common areas may include, but shall not be limited to, open and enclosed courts, malls and atriums, public walkways and promenades, escalators, elevators and stairways, public rest rooms, shipping and receiving areas and docks, landscaped areas, passages for trucks and automobiles, and other areas not leased to or reserved for the exclusive use of any tenant or occupant of the Building, as well as maintenance and mechanical areas, utility plants, pipes, conduits and similar areas or facilities and any management offices, promotional offices or other areas used in connection with the management and operation of the Property. Landlord agrees to maintain the common areas in good condition and repair and shall at all times during the Term of this Lease maintain a reasonable means of egress and ingress to any portion of the Premises for which access is provided through the common areas.

Tenant and its permitted concessionaires, officers, employees, agents, customers and invitees shall have a non-exclusive license, in common with Landlord and all others to whom Landlord has or may hereafter grant rights, to use the common areas as designated from time to time by Landlord, subject to such uniform rules and regulations as Landlord may from time to time adopt. Tenant agrees to abide by such rules and regulations and to cause its permitted concessionaires, officers, employees, agents, customers and invitees to conform thereto. Such regulations may include the designation of the days and hours during which the common areas of the retail and restaurant portions of the Building shall be open to the public, subject to the provisions of Section 11.1.4 below. Tenant shall not at any time interfere with the rights of Landlord or other tenants, its and their officers, employees, agents, customers, and invitees, to use any part of any common area.

Landlord may, from time to time, change the size, location and nature of any common area, add to or delete portions thereof, withdraw all or any portions of the common areas from use as such, and make, alter, move or remove installations therein, including but not limited to kiosks, displays and similar structures. In addition, Landlord may, at any time, and from time to time, temporarily close or consent to the closing of any common areas to make repairs or changes therein, to prevent the acquisition of public rights therein, to discourage the improper use thereof, or for any other purpose and may take such other actions in regard to the common areas as in Landlord's judgment may be desirable, all such common areas remaining at all times in the exclusive control and management of Landlord. Landlord shall not be subject to liability therefor, nor shall Tenant be entitled to any compensation, or diminution or abatement of rent,

130007072v6 0912315 73489

nor shall any such action be deemed an actual or constructive eviction of Tenant. Notwithstanding anything to the contrary contained in this Lease, Landlord may not make any changes to the common areas which materially and adversely affect access to and/or visibility of the Premises.

The common areas may also include other areas and facilities (including parking lots or facilities) which are not part of the Property but which from time to time are designated by Landlord to be part of the common areas and which are used in connection with the operation of the Property (regardless of whether the use thereof shall require the payment of fees). Such areas may be the subject of easements, licenses, leases or agreements between Landlord and the owner or owners thereof.

**Section 2.     Construction of the Premises.**

**Section 2.1     Landlord's Work.** The work which Landlord is obligated to perform is set forth in **Exhibit B-1** attached hereto and made a part hereof by reference (hereinafter referred to as "**Landlord's Work**"). Except as provided in **Exhibit B-1**, Landlord shall not be obligated to make any improvements or undertake any construction to render the Premises suitable for occupancy by Tenant. Tenant hereby acknowledges that (i) it has been afforded full and adequate opportunity to inspect the Premises; (ii) it is familiar with and accepts the condition of the same except for Landlord's completion of Landlord's Work; (iii) Tenant shall be solely responsible for all work necessary to make the Premises ready for Tenant's occupancy except for Landlord's Work specified in **Exhibit B-1**, and (iv) Landlord has not agreed to make any changes, additions or alterations in or to the Premises, or to perform any work therein other than Landlord's Work.

**Section 2.2     Tenant's Work.** All work other than that to be performed by Landlord as Landlord's Work shall be performed by Tenant, at Tenant's sole cost and expense as set forth in **Exhibit B-2** attached hereto and made a part hereof by reference (hereinafter referred to as the "**Tenant's Work**"). Tenant shall be responsible for and shall obtain and pay for all approvals, inspections and/or permits from the City of Chicago or other governmental authorities having jurisdiction necessary for the performance of Tenant's Work and for Tenant's use and occupancy of the Tony n' Tina Space upon completion of Tenant's Work.

**Section 2.3     Tenant's Plans.** Tenant shall, at Tenant's sole cost and expense, and prior to the commencement of any of Tenant's Work, cause to be prepared and delivered to Landlord for its approval, three (3) sets of preliminary plans and specifications (hereinafter referred to as the "**Preliminary Plans**") which comply with the provisions of Exhibit C, the Design Criteria set forth in Exhibits D and E, and all applicable statutes, ordinances, regulations and codes. Such Preliminary Plans shall be submitted to Landlord on or before the date set forth in the Schedule for submission of Tenant's Preliminary Plans.

Within ten (10) days after receipt by Landlord of the Preliminary Plans, Landlord may notify Tenant that its Preliminary Plans fail to conform to Exhibits C, D or E, Tenant shall promptly cause such Preliminary Plans to be revised to conform thereto, and shall, within seven (7) days from the date Landlord notifies Tenant that such plans fail to conform, resubmit them to Landlord for its approval. Landlord shall, upon approval, initial and return one set of the

130007072v6 0912315 73489

Preliminary Plans to Tenant. In the event that Landlord fails to notify Tenant of any revisions required to the Preliminary Plans within such 10 day period, then the Preliminary Plans shall be deemed to be approved by Landlord.

Tenant shall, within forty-five (45) days after its Preliminary Plans have been approved by Landlord, at its own cost and expense, cause to be prepared and deliver to Landlord for its approval, four (4) sets of complete plans and specifications (hereinafter referred to as the "**Final Plans**"), including working drawings, covering Tenant's Work as described in Exhibit C in such detail as Landlord may require and in conformity with the Preliminary Plans, Exhibits C, D and E, and applicable statutes, ordinances, regulations and codes, and certified by both a licensed registered architect and a licensed registered professional engineer, plus the name of the contractor and subcontractors who will perform the Tenant's Work together with evidence satisfactory to Landlord that such contractors and subcontractors have in effect insurance policies providing Worker's Compensation insurance in accordance with statutory requirements and comprehensive public liability insurance and other insurance in amounts and with such coverage as Landlord may require, all such insurance policies naming Landlord, Landlord's agents, Landlord's mortgagee(s), if any, and their respective agents as additional insureds thereunder.

Within ten (10) days after receipt by Landlord of the Final Plans, Landlord may notify Tenant that its Final Plans fail to so conform, Tenant shall promptly cause such Final Plans to be revised to conform thereto and shall, within seven (7) days from the date Landlord notifies Tenant that such plans fail to conform, resubmit them to Landlord for its approval. Landlord shall, upon approval, initial and return one set of the Final Plans to Tenant. In the event that Landlord fails to notify Tenant of any revisions required to the Final Plans within such 10 day period, then the Final Plans shall be deemed to be approved by Landlord.

Tenant shall not be given possession of the Tony n' Tina Space and shall not commence any of the Tenant's Work unless and until its Final Plans have been approved by Landlord. Landlord does not, by its approval of Tenant's Preliminary Plans or Final Plans, undertake any liability for the design of Tenant's Work; including, but not limited to, any equipment or other facilities to be installed in the Tony n' Tina Space by Tenant, nor shall any such approval constitute a representation by Landlord that such plans depict improvements which are fit for their intended purpose or that the same comply with any applicable law, ordinance or regulations, nor shall Landlord, by its approval of such plans, be deemed to have made any warranty or representation.

**Section 2.4      Intentionally omitted.**

**Section 2.5      Construction of Landlord's Work.** Landlord shall diligently perform or cause to be diligently performed, at Landlord's cost, Landlord's Work. Tenant's taking possession of the Tony 'n Tina Space shall be conclusive evidence that the Tony 'n Tina Space was then in good order and satisfactory condition, subject to Landlord completing Landlord's Work in accordance with **Exhibit B**, and subject to latent defects; provided, however, Tenant shall not be entitled to object to any such latent defects subsequent to the one (1) year anniversary date of this Lease. No promise of Landlord to alter, remodel, improve, repair, decorate or clean the Premises or the Building, or any part thereof, and no representation

respecting the condition of the Premises or the Building has been made to Tenant by Landlord except as set forth in **Exhibit B.**

Section 2.6    **Proof of Completion of Tenant's Work.**    When Tenant has completed all work necessary to make the Tony n' Tina Space ready for Tenant's opening for business in the Tony n' Tina Space in accordance with the provisions of this Lease, Tenant shall, prior to opening for business in the Tony n' Tina Space , furnish evidence satisfactory to Landlord that all such work has been completed and that the Tony n' Tina Space is ready for Tenant's occupancy and opening for business. Such evidence shall include, but shall not be limited to, copies of the Certificate of Occupancy and/or Occupancy Permit(s) issued by the City of Chicago for the Tony n' Tina Space, if any. Tenant shall also request Landlord's inspection and acceptance of Tenant's Work as provided in Exhibit D. Tenant shall also provide Landlord not later than thirty (30) days after Tenant opens for business in the Tony n' Tina Space: (i) itemized statements showing the total cost of Tenant's Work, certified to be true and correct by one of the Tenant's officers or proprietors; and (ii) evidence that all of the Tenant's Work and other work done by or on behalf of Tenant which could give rise to any mechanics' or materialmen's liens has been paid for in full and that any and all liens therefor that have been or may be filed have been satisfied of record or waived.

Section 2.7    **Compliance with Exhibits C and D.**    Notwithstanding anything to the contrary contained in this Lease, Landlord acknowledges and agrees that Tenant will be required to comply with **Exhibit C** and **Exhibit D** to this Lease only in the event Tenant constructs any alterations, improvements or additions to the Premises subsequent to the Commencement Date which require Landlord consent as set forth herein.

**Section 3.    Rent.**    Tenant shall, beginning on the Commencement Date, pay to Landlord, in care of Landlord's Managing Agent, Mid-America Asset Management, Inc., 230 West North Avenue, Chicago, IL 60610, or to such other person or at such other place as Landlord shall designate in writing to Tenant from time to time, in legal tender of the United States at the time of payment, Base Rent and Additional Rent as set forth in this Article 3.

Section 3.1    **Base Rent.**    Tenant shall pay the amount shown in the Schedule as Base Rent. Base Rent shall be payable in equal monthly installments without demand, offset or deduction, in advance, on the first day of each calendar month during the Main Term.

If the Rent Commencement Date set forth in the Schedule is on a day other than the first day of the calendar month, the Base Rent for such month and, if necessary, for the last month of this Lease will be prorated on a per diem basis, and the first full monthly installment of Base Rent paid by Tenant concurrently with the execution of this Lease shall be applied to the first full calendar month of the Main Term.

Section 3.2    **Percentage Rent.**    Intentionally omitted.

Section 3.3    **Additional Rent.**    In addition to Base Rent, Tenant shall pay to Landlord as Additional Rent Tenant's Proportionate Share, as defined below, of Operating Expenses and Taxes (both as hereinafter defined) for each Lease Year or Partial Lease Year. Additional Rent shall be paid in monthly installments at the same time as installments of Base Rent are due and payable, in an amount estimated by Landlord as hereinafter provided, subject to adjustments as

8

hereinafter provided. For purposes of this Lease, the term "**Tenant's Proportionate Share**" shall be defined as the portion of the whole of the cost of such item which the rentable square footage of the Premises bears to the rentable square footage of all spaces in the Building, whether or not leased or occupied, including the Premises. For purposes of determination of Tenant's Proportionate Share, the rentable square footage of each space in the Building, including, without limitation, the Premises, shall be measured from the exterior walls at said space provided, however, if there shall be a common wall dividing the store from the adjoining premises, then rentable square footage area shall be measured from the center of such common walls. The rentable square footage of the Premises as of the date of this Lease is set forth on line (g) appearing on the Schedule Page.

      **3.3.1 Operating Expenses.** For purposes of this Lease, "**Operating Expenses**" shall mean the sum of all costs, expenses, and disbursements of every kind, nature or description which Landlord or its agents are or shall become obligated to pay in connection with the ownership, management, operation, maintenance, promotion, marketing, policing, equipping, protecting, heating, cooling, lighting, ventilating, insuring, repair and replacement of the Building and the Property and of the personal property, fixtures, machinery and equipment (including the operation, maintenance, repair and replacement of any elevators and escalators), and systems located therein or used in connection therewith. Operating Expenses shall include, but shall not be limited to, the cost of: capital improvements to the Building, including, without limitation, repairs and replacements of the roofs, exterior walls, foundations, gutters and other roof drainage systems (provided that such costs are amortized over the anticipated useful life of such improvements with reasonable interest under generally accepted accounting principles and are either incurred to replace obsolete and worn out equipment, systems or components or to reduce Operating Expenses), license and permit fees, cleaning of the common areas, the portions of the Property surrounding the Building and areas used for storage; removal of rubbish and other refuse; maintenance and operation of the Property; painting; fire and security protection (including hydrant charges); operating equipment providing heating, cooling and ventilating (provided that the cost to install or replace any such equipment are amortized over the anticipated useful life of such improvements with reasonable interest under generally accepted accounting principles and are either incurred to replace obsolete and worn out equipment, systems or components or to reduce Operating Expenses); pest and vermin control and extermination services; exterior illumination of the Building and the Property and illumination of the common areas (including the cost of bulbs and electric current); cost and maintenance of common signs; removal of snow and ice; providing, maintaining and replacing flowers, plants and landscaping; restoration and preservation of works of art or other decorative features in the common areas or on the exterior portions of the Building or the Property including seasonal decorations; window washing in the common areas and on the exterior of the Building; water and sewage charges; insurance premiums for liability, fire, extended coverage, malicious mischief, vandalism, worker's compensation, defamation, false arrest, rent insurance, and other insurance; costs of all personnel including, but without limitation, security, maintenance personnel and costs of outside consultants deemed reasonably necessary by Landlord to effectively operate the Property; fees for audits (excluding those audits demanded by a tenant or tenants); lease payments, fees or other charges or payments or costs (including personnel costs) incurred in connection with the operation or use of any parking lots or other property utilized in connection with the Property; licenses and permits; supplies; operation of loudspeakers and any other equipment supplying music to any common areas; reasonable depreciation of, or rents paid

for, the leasing of equipment used in the operation of the Building or the Property or financing charges paid under any installment purchase agreements therefor, sound systems; personal property and similar taxes, and a reasonable management fee to the affiliates of Landlord or other entities providing management services or management consultation in connection with the operation of the Property, including a leasing and/or management office maintained by Landlord regardless of whether located on the Property or elsewhere. Operating Expenses shall not include any administrative charge. Tenant's obligation for its Proportionate Share of Operating Expenses shall survive the expiration or sooner termination of this Lease. Notwithstanding anything to the contrary contained in this Lease, the following items shall be excluded from "**Operating Expenses**" for purposes of computing Tenant's Proportionate Share thereof: (a) the cost of repairs or other work occasioned by fire, windstorm or other casualty or by the exercise of eminent domain to the extent of Landlord's receipt of proceeds or awards, except for amounts equal to deductibles under the applicable insurance policies required to be carried by Landlord as required pursuant to this Lease, which deductibles shall be reasonable in light of the insurance premiums; (b) leasing commissions, attorneys' fees, costs and disbursements and other expenses incurred in connection with negotiations or disputes with tenants, other occupants or prospective tenants or occupants of the Building; (c) the cost of renovating or otherwise improving, decorating, painting or redecorating space for tenants or other occupants of the Building; (d) Landlord's cost of electricity and other services that are sold to tenants and for which Landlord is entitled to be reimbursed by tenants as an additional charge or rental over and above the basic rent, taxes and operating expense payable under Landlord's lease with such tenant; (e) depreciation and amortization, except as otherwise provided in this Section 3.3.1; (f) expenses in connection with services or other benefits of a type which are not provided to Tenant but which are provided to another tenant or occupant of the Building; (g) penalties or fines incurred by Landlord due to violation by Landlord or any tenant of the terms and conditions of any lease; (h) interest or principal payments (or both) on any debt or mortgage affecting the Building, the Property or Landlord; (i) all items and services for which Tenant or any other tenant in the Building is separately charged, for which Landlord is reimbursed by Tenant or any other tenant in the Building or which Tenant or any other tenant in the Building pays to third persons; (j) marketing costs for vacant spaces; (k) any fines or penalties incurred due to violations by Landlord of any governmental rule or authority; (l) wages, salaries, or other compensation paid to any executive employee by Landlord or Landlord's Agent above the grade of building manager or building superintendent; (m) construction or other work performed by Landlord for any other tenant in the Building, whether or not Landlord is entitled to be reimbursed for the cost of such work; (n) the cost of refinancing debt; (o) rent concessions made to other tenants; and (p) the cost of repairs made necessary as a result of the negligence of Landlord or another tenant. Landlord shall use due diligence and seek competitive bids, when available, except in the case of an emergency, in contracting for all elements of Operating Expenses, for purposes of assuring Tenant that all Operating Expenses incurred by Landlord are competitive and are based upon prices generally available in the marketplace for like services, materials and equipment.

     **3.3.2   Taxes.** For the purposes of this Lease, "**Taxes**" shall mean all federal, state and local governmental taxes, assessments and charges (including transit or transit district taxes or assessments) of any kind or nature, whether general, special, ordinary or extraordinary, which Landlord or its agents shall pay or become obligated to pay because of, in connection with or allocable to the ownership, leasing, management, control or operation of the Property or of the personal property, fixtures, machinery, equipment, systems and apparatus located therein or used

10

in connection with the Property for any calendar year wholly or partly within the Term. If a special assessment payment in installments is levied against the Property, Taxes for any calendar year shall include only the installments of such assessment, and any interest, payable with respect to such calendar year.

There shall be included in Taxes for any calendar year the amount of all fees, costs and expenses (including consultants', appraisers' and attorneys' fees) paid by Landlord during such calendar year in negotiating, or seeking or obtaining any reduction of, Taxes. Tenant hereby expressly waives any and all rights now or hereafter conferred upon it by law to independently contest or appeal any Taxes.

Taxes shall not include any federal or state franchise, capital stock, inheritance, income, gift taxes, generation skipping taxes or estate taxes, provided, however, that if at any time during the Term, the methods of taxation prevailing at the date hereof shall be altered so that in lieu of, or in addition to, or as a substitute for, the whole or any part of the taxes levied, assessed or imposed on all or any part of the Property there shall be levied, assessed or imposed (i) a tax, assessment, levy, imposition or charge based on the rents received therefrom, whether or not wholly or partially as a capital levy or otherwise, or (ii) a license fee measured by the rents received by Landlord from the Property or any portion thereof or the number of square feet of space rented by Landlord, or (iii) a tax or license fee which is otherwise measured by or based in whole or in part upon the Property or any portion thereof, or (iv) any other similar tax, levy, imposition, charge or license fee however described or imposed, then the same shall be included as Taxes hereunder, as though the Property was the only property of Landlord subject to such tax. Tenant's obligation for its Proportionate Share of Taxes accrued during the Term shall survive the expiration or sooner termination of this Lease.

        **3.3.3   Landlord's Records of Operating Expenses and Taxes.** Landlord shall maintain books and records showing Operating Expenses and Taxes, including any necessary allocations thereof made by Landlord, in accordance with sound accounting and management practices. Landlord's allocation of such Operating Expenses and Taxes shall be final, binding and conclusive unless Tenant shall notify Landlord in writing of any dispute or questioned items with respect thereto within six (6) months after its receipt of a final Additional Rent Statement for the applicable calendar year.

        **3.3.4   Tenant Payments of Additional Rent.** Prior to the Commencement Date, Landlord will provide Tenant with a good faith estimate of the amount of Operating Expenses and Taxes for the first Lease Year or Partial Lease Year (as the case may be) of the Main Term, Tenant's Proportionate Share thereof, and the amount of the monthly installments of Additional Rent due from Tenant to Landlord. As soon as practical after the expiration of the first Lease Year or Partial Lease Year, as the case may be, and each subsequent Lease Year or Partial Lease Year (or earlier if such amounts are then known), Landlord shall cause to be prepared, and shall forward to Tenant, a statement (the "**Additional Rent Statement**") in writing certified by Landlord or its agent, setting forth, for the then most recently ended Lease Year or Partial Lease Year, the following: (i) Operating Expenses; (ii) Taxes (provided, however, that if the tax bills for such Lease Year or Partial Lease Year are not available as of the date of the Additional Rent Statement, the amount of such Taxes may be reasonably estimated); (iii) Tenant's Additional Rent for the most recently ended Lease Year or Partial Lease Year and the

total amount of Additional Rent actually paid by Tenant during such period; (iv) Landlord's estimate of Additional Rent for the then current Lease Year or Partial Lease Year and the monthly installments thereof; and (v) the amount, if any, due Landlord from Tenant or due to Tenant from Landlord for both the most recently ended Lease Year or Partial Lease Year and for the expired portion of the then current Lease Year or Partial Lease Year up to and including the month during which the Additional Rent Statement is rendered. In the event that such statement indicates that the amount of Additional Rent paid by Tenant to Landlord is less than the amount due Landlord for the period in question, Tenant shall pay the full amount of such deficiency to Landlord within thirty (30) days from the date of such statement. In the event that such statement indicates that Tenant has paid Landlord a total amount of Additional Rent in excess of the amount due Landlord for the period in question, Landlord shall, except as provided in Section 3.7 below, credit Tenant with such excess against the next installment(s) of Additional Rent due to Landlord from Tenant. Commencing with the first day of the month following the date of the Additional Rent Statement, and continuing thereafter until Landlord renders the next Additional Rent Statement to Tenant, the monthly installments of Additional Rent due from Tenant to Landlord will be the monthly installments of Additional Rent for the current Lease Year or Partial Lease Year as estimated by Landlord as set forth in the said Additional Rent Statement. Landlord shall, upon the written request of Tenant, during a period of six (6) months following the delivery of an Additional Rent Statement give Tenant reasonable access during normal business hours to such books and records and supporting documentation utilized in computing either or both of the actual Operating Expenses, Taxes and Additional Rent. Unless Tenant shall take written exception to any item within thirty (30) days following any such inspection, the amount of Additional Rent and Tenant's Proportionate Share thereof as shown in such Additional Rent Statement shall be considered final and accepted by Tenant

**Section 3.4    All Amounts Constitute Rent.**  All amounts due Landlord under the terms of this Lease, including but without limitation, amounts due under this Section 3, are referred to collectively as "**Rent**". All Rent shall be paid by Tenant when due without any setoff, deduction or prior demand, and without Landlord's submission of any statements, bills or notices therefor.

**Section 3.5    Late Charges.**  Tenant agrees to pay a late charge of one and one-half percent (1.5%) of the amount of Rent then due if Rent or any portion thereof is not paid within ten (10) days after the due date thereof. Such late charges shall be in addition to Landlord's other rights upon default by Tenant. In addition, any payment due from Tenant to Landlord not received by Landlord upon the date herein specified to be paid shall bear interest from the tenth (10th) day after such payment is due to the date of actual payment at the rate of twelve percent (12%) per annum or the highest lawful rate of interest permitted in Illinois, whichever rate of interest is lower.

**Section 3.6    Independent Covenant.**  Tenant's covenant to pay Rent shall be independent of every other covenant set forth in this Lease. The obligation of Tenant to pay Rent for all Lease Years or Partial Lease Years during the Term shall survive the termination of this Lease.

**Section 3.7    Under/Over Payments by Tenant.**  If pursuant to any of the foregoing provisions it shall be determined that Tenant has paid Landlord Additional Rent in amounts in

130007072v6 0912315 73489

excess of those which shall actually be due Landlord under the terms of this Lease, Landlord may apply such excess as above provided, or may, in Landlord's discretion, apply such excess against any other amounts of Rent then due from Tenant to Landlord, and credit any then remaining excess against future Rent due from Tenant. If such amount exceeds the balance of Rent due for the Term, Landlord shall pay to Tenant the amount of such excess not theretofore credited to Tenant upon the expiration of the Term within thirty (30) days after submission of an Additional Rent Statement to Tenant or other determination of the amount of the excess; provided, however, that Landlord shall be entitled to offset against such payment of any amounts then due and unpaid from Tenant to Landlord.

Tenant agrees that any payment by Tenant or acceptance by Landlord of a lesser amount than shall be due from Tenant to Landlord shall be treated as a payment on account of the earliest stipulated Rent then due and payable. The acceptance by Landlord of a check for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying such check, that such lesser amount is payment in full shall be of no effect, and Landlord may accept such check without prejudice to any other rights or remedies which Landlord may have against Tenant

**Section 3.8    Disputes.** Except for matters arising in connection with Section 3.3.4 of this Lease, if Tenant contests or disputes any or all of the matters set forth in any statements concerning Rent rendered by Landlord to Tenant, Tenant shall nevertheless pay to Landlord the amount(s) required to be paid by Tenant pursuant to such statement(s) and forward with the payment or first payment, as applicable, to be made pursuant to such statement a notice in writing executed by Tenant (the "**Dispute Notice**") specifying Tenant's contest of or dispute with the statement(s). The delivery by Tenant of the Dispute Notice will not either delay or avoid Tenant's covenants and obligations to pay Rent as set forth in the statement(s), nor permit Tenant to make any offsets against Rent due or to become due, but shall only evidence a non-waiver by Tenant of the matters set forth in the Dispute Notice. The failure of Tenant to forward the Dispute Notice as aforesaid shall conclusively constitute an approval by Tenant of all matters set forth in the statement. Tenant acknowledges that Landlord's ability to budget and incur expenses depends on the finality of such statement and accordingly agrees that time is of the essence of this Section 3.8. If Tenant takes exception to any matter contained in any statement as provided herein, Landlord may, but shall not be obligated to, refer the matter to an independent certified public accountant, whose certification as to the proper amount shall be final and binding as between Landlord and Tenant. Tenant shall promptly pay the cost of such certification unless such certification determines that Tenant was overbilled by more than three percent (3%).

**Section 4.    Security Deposit.** As additional security for the faithful and prompt performance of its obligations hereunder, including but not limited to the obligation to pay Rent, Tenant has submitted to Landlord or its agent the sum shown in the Schedule as the Security Deposit. Said Security Deposit may be applied by Landlord for the purpose of curing any default or defaults of Tenant hereunder, in which event Tenant shall replenish said Security Deposit in full by promptly paying to Landlord the amount so applied. Landlord shall not be obligated to pay interest on said Security Deposit. If, after the expiration of the Term by the passage of time or otherwise, Tenant is not in default hereunder, Landlord shall return said deposit, or the then remaining portion thereof, to Tenant. Said deposit will be paid to Tenant in cash within thirty (30) days after expiration of the Term, provided Tenant has paid all amounts due under this

Lease. Said deposit shall not be deemed an advance payment of Rent or a measure of Landlord's damages for any default hereunder by Tenant. The application of all or any portion of the Security Deposit by Landlord or the return of the Security Deposit to Tenant by Landlord shall not be deemed a waiver by Landlord of any defaults by Tenant under the terms of this Lease or a release of Tenant by Landlord in respect thereto.

Landlord shall deliver said Security Deposit to the purchaser or transferee of Landlord's interest in the Property or the Building in the event such interest shall be sold or transferred. Landlord shall thereupon be completely discharged and released from all further liability with respect to said Security Deposit and the return thereof to Tenant, and Tenant agrees to look solely to said purchaser or transferee for the return of said Security Deposit.

**Section 5.**     **Advertising and Promotion.**

    **Section 5.1**     **Intentionally omitted.**

    **Section 5.2**     **Intentionally omitted.**

    **Section 5.3**     **Intentionally omitted.**

    **Section 5.4**     **Merchants' Association.**   Landlord may, but shall not be obligated to, establish a Piper's Alley Merchants' Association. In the event that Landlord shall establish a Piper's Alley Merchants' Association, Landlord may, but need not, delegate to it such duties and responsibilities for advertising, promotion and public relations, or such other duties as Landlord, in its sole discretion, may choose; provided, however, any such delegation shall be revocable by Landlord upon thirty (30) days notice of such revocation, and Landlord shall have the right to redelegate to itself or its agent any of said duties and responsibilities. Promptly following any formation of a Piper's Alley Merchants' Association, Tenant may, at its option, join with other tenants in the activities, including any joint promotions, sponsored by the Merchants' Association. Tenant agrees that the right to form a Piper's Alley Merchants' Association shall be the exclusive right of Landlord, and Landlord shall not be obligated to recognize any such organization established without the consent of Landlord or to delegate to such organization any of the rights of Landlord hereunder.

**Section 6.**     **Use.**

    **Section 6.1**     **Use of the Premises.**   Tenant shall occupy and use the Premises only for the Permitted Use set forth in the Schedule, and for no other uses or purposes whatsoever without Landlord's prior written consent, which consent Landlord may withhold in its absolute discretion. The foregoing specific use is a material consideration to Landlord in order that there will be maintained within the Property an appropriate tenant mix so as to achieve the maximum gross sales for all retail tenants and to assure the continued operation of a full service retail development. Tenant acknowledges that no representations have been made to Tenant that any other tenant will lease space within the Property, and that Tenant has no exclusive right to sell merchandise, goods or services of any type or character, except that Tenant shall, as long as Tenant continues to operate any or all of its Mainstage Theatre, etc. Theatre and Skybox Theatre in the Building in accordance with the terms of this Lease, have the sole and exclusive right, and Landlord shall not permit any other tenant in the Building, to (i) market and sell any and all

Second City memorabilia, souvenirs and other Second City merchandise, (ii) conduct live improvisational sketch performances, and (iii) conduct improvisational classes.

**Section 6.2     Use of Common Areas**.  Landlord further grants to Tenant, its employees, agents, customers and invitees, the non-exclusive right to use those portions of the Property from time to time designated by Landlord as common areas, subject to all of the terms, covenants and conditions contained in this Lease. Notwithstanding the foregoing, Tenant understands and agrees that nothing contained in this Lease, nor the designation by Landlord of any portions of the Property as part of the common areas nor the receipt by Landlord from Tenant of Additional Rent shall be deemed to impose on Landlord any duty or obligation to acquire, designate or make available to Tenant or others any specific portions of the Property as common areas or to continue to make any certain common areas available, except as specifically provided elsewhere in this Lease.  Tenant shall not be deemed a party to, or beneficiary of, any agreement(s) by which Landlord makes any parking or other areas not part of the Property available for use in connection with the use of the Property nor shall Tenant have any rights or interest therein except as herein provided.

**Section 7.     Landlord's Repair Obligations.**  Throughout the Term, except for any work made necessary by any act, omission, or neglect of Tenant, its agents, employees and invitees, and except for repairs necessitated by any damage or destruction by fire or other casualty or by a taking under the power of eminent domain (in which events the obligations of Landlord shall be controlled by Sections 13 and 14 hereof), Landlord shall keep in repair and maintain all structural elements of the Building (including the foundation walls, the exterior walls and doors and the roof); the stairwells, elevators and escalators located in common areas of the Building; the lobby and other common areas of the Building; glass located in the exterior walls of the Building (subject to the provisions of Section 11.1.8); the mains, conduits and systems providing electricity, water and other services in accordance with **Exhibit C** and **Exhibit D**; the exterior of the Property, including landscaped areas, walks, driveways and loading areas; all in the manner reasonably determined by Landlord to be consistent with the nature and character of the Building as an attractive, destination-type entertainment and retail, mixed use development and other similar developments in the vicinity of the Building and subject to the terms and provisions of this Lease.

**Section 8.     Utilities and Other Services.**

**Section 8.1     Electricity and Gas.**  All necessary wiring and mains to bring electricity and gas to the Premises shall be installed in accordance with and subject to **Exhibit B**, **Exhibit C** and **Exhibit D** of this Lease.  The Premises will be individually metered for the electricity and gas consumed therein.  Tenant shall pay the entire cost of all electric and gas service and the cost of metering (including meter installation) directly to the provider thereof.

**Section 8.2     Telephone**.  To the extent telephone service does not exist, Tenant shall make its own arrangements for such telephone service in the Premises as may be desired by Tenant.  Tenant shall pay all charges, including but not limited to, the cost of installation of necessary wiring not provided by Landlord made by the company providing telephone service in connection with or relating to the providing of telephone service to the Premises.

130007072v6  0912315  73489

**Section 8.3    Heating, Ventilating and Air Conditioning**.  Except to the extent such equipment is already located in the Premises, and except as otherwise provided as part of Landlord's Work, Tenant shall, at its own cost and expense, and with its own equipment installed in accordance with **Exhibit B** and **Exhibit C**, heat and cool the Premises to meet all of its requirements.  Tenant agrees to maintain all heating, cooling and ventilating equipment servicing the Premises in good order and repair and to make necessary replacements thereof.  Without limiting the foregoing, Tenant agrees to enter into and to keep in full force and effect at all times during the Term a contract for the maintenance of the heat pump(s) in the Premises with a contractor approved by Landlord and, on request, to furnish Landlord a copy of that contract. The Premises will be individually metered for the quantity of water supplied to the Premises used by Tenant for heating and air conditioning and Tenant shall pay the entire cost thereof.

**Section 8.4    Water and Sewer**.  The Premises will be individually metered for all water consumed within the Premises.  Tenant shall pay the entire cost of such water service and the cost of metering or sub- metering (including installation) directly to the provider thereof.

**Section 8.5    Other or Increased Services**.  If Tenant desires telegraphic, teletext, television, or other forms of communications, signal or data transmission services, security services, or if Tenant desires to install any computer, data processing or other equipment in the Premises, or if Tenant's use of the Premises requires additional or increased electric or other service than that provided by Landlord, and providing such services or equipment necessitates the installation of new or additional wires, cables, transmitters, signal reception devices or other facilities or equipment outside the Premises, Tenant shall make all necessary arrangements directly with the company or companies providing such services; provided, however, that (i) Tenant shall not make any such installations without the consent of Landlord, which consent Landlord may withhold in its reasonable discretion, or, if given, subject to such terms and conditions as Landlord may reasonably determine; (ii) Landlord shall direct where and how all connections for such services shall be introduced and run, and Tenant shall not make or permit others to make borings, cuttings or installations of wires, cables or equipment in or about the Premises or the Building except in the locations and in the manner reasonably approved by Landlord; (iii) Tenant shall not, by its installation or use of such equipment or facilities or services cause unreasonable interference with the operation of equipment, facilities or services elsewhere in the Building by Landlord or other occupants of the Building or on adjoining properties; and (iv) in no event shall Tenant install any equipment in the Premises in connection with or in order to provide such services or installations which is visible from outside the Building.  Tenant shall pay the entire cost of installation of any such facilities and the cost of such service(s) and shall reimburse Landlord for any reasonable costs incurred by Landlord in connection therewith, including the fees of Landlord's architects and engineers.

**Section 8.6    Cleaning**.  Tenant shall arrange for its own janitor or cleaning services for the Premises, at its sole cost and expense, provided that such services shall be performed by contractors or employees consented to in writing by Landlord and subject to such conditions as Landlord may specify.  Tenant's obligations in regard to the cleaning of the Premises shall include, but shall not be limited to, the cleaning of all glass in the Premises including the inside and outside surfaces of any glass storefronts, display windows, doors, partitions or other glass surfaces except for the outside surface of any glass located in the exterior walls of the Building which shall be the obligation of Landlord.

130007072v6 0912315 73489

**Section 8.7    Lighting.**  Tenant shall be responsible for providing all light fixtures in the Premises, subject to the provisions of **Exhibit C** and **Exhibit D** and the installation, cleaning and maintenance thereof, and shall provide, at Tenant's sole cost and expense, all lamps, bulbs, tubes, ballasts and starters necessary for the maintenance thereof.

**Section 8.8    Interruptions.**  Landlord does not warrant that any services or Tenant's occupancy will be free from interruptions caused by repairs, renewals, improvements, changes of service, alterations, strikes, lockouts, labor controversies, accidents, inability to obtain fuel, steam, water or supplies or other causes. No such interruption of service shall be deemed an eviction or disturbance of Tenant's use and possession of the Premises or any part thereof or render Landlord liable to Tenant for damages by abatement of Rent or otherwise or relieve Tenant from performance of Tenant's obligations under this Lease. Tenant hereby waives and releases all claims against Landlord for damages, both direct and consequential, for any such interruptions or stoppages of services. To the extent Landlord provides any services, Landlord may at any time cease to furnish such services, provided Tenant is connected at Landlord's expense to an alternate source of such services. Notwithstanding the foregoing, if such services shall be interrupted for more than forty-eight (48) consecutive hours for reasons associated with Landlord's gross negligence, Rent shall abate for the remaining duration of such interruption.

Landlord shall have the right at all reasonable times during the Term, upon reasonable prior notice to Tenant (except in case of emergency), to enter the Premises for the purpose of inspecting the same and of making such repairs or replacements therein as may be required by this Lease or as Landlord may deem reasonably necessary or desirable, including without limitation the rehabilitation or replacement of the systems serving the Building or the exterior and structural components thereof, provided, however, that Landlord shall use all reasonable efforts not to disturb Tenant's use and occupancy and shall, when practical, give Tenant at least 24 hours prior written notice of such entry. If Tenant's access to or reasonable use of the Premises is prevented by reason of repairs or rehabilitation to the Premises being made by Landlord, Landlord shall not be liable to Tenant, but Rent shall abate during the entire period Tenant is unable to gain access to or reasonably use the Premises.

**Section 9.    Insurance.**

**Section 9.1    Coverages.**

**9.1.1    Tenant.**  Tenant, at Tenant's expense, with a blanket policy covering the Premises and other properties if desired by Tenant, shall maintain in force with responsible companies approved by Landlord and in amounts from time to time reasonably approved or requested by Landlord:

(i)    commercial general liability insurance, including (but not limited to) Dram Shop and Host Liquor Liability insurance, if applicable, against assumed or contractual liability under this Lease, with respect to liability arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto, made by or on behalf of any persons, firm or corporation, arising from, related to, or connected with the conduct and operation of Tenant's business in the Premises and the businesses of all of Tenant's permitted

17

sublessees, concessionaires and licensees, insuring Landlord, Landlord's agents, Landlord's mortgagee(s), if any, and Tenant, as their interests may appear, to afford protection with respect to personal injury, death or property damage of not less than Two Million Dollars ($2,000,000) per occurrence combined single limit/Five Million Dollars ($5,000,000) general aggregate (but not less than, $2,000,000 per location aggregate);

      (ii)      plate glass insurance covering all plate glass in the Premises;

      (iii)     worker's compensation insurance in the amounts required by applicable statute and employer's liability insurance;

      (iv)     contractual liability insurance covering the indemnity set forth in Section 11.1.16 hereof;

      (v)      fire insurance with extended coverage endorsements including, but not limited to, vandalism and malicious mischief, covering all equipment installed by Tenant in the Premises, all of Tenant's Work and all of Tenant's stock in trade, trade fixtures, furniture, furnishings and floor coverings in the Premises to the extent of one hundred percent (100%) of their replacement cost and naming Landlord, Landlord's Agent and Landlord's mortgagee(s), if any, as additional insureds; and

      (vi)     boiler and machinery equipment insurance, if applicable.

    **9.1.2   Landlord.** Landlord shall maintain fire and extended coverage insurance insuring at least ninety percent (90%) of the full replacement value of the Building during the Term with such coverages, co-insurance and deductibles as are customary in similar mixed-use buildings in the neighborhood of the Property from time to time, the cost of which shall be included in Operating Expenses. Landlord's insurance may be provided pursuant to blanket policies. Landlord shall, from time to time upon written request from Tenant, deliver to Tenant evidence of the maintenance of such insurance.

    **Section 9.2   Form of Insurance**. All insurance provided by Tenant shall be in form reasonably satisfactory to Landlord, shall be primary and non-contributory, shall not be subject to deductible(s) in excess of $5,000 (except coverage for earthquake and flood may have up to a $25,000 deductible) unless approved in writing by Landlord, and shall provide that it will not be subject to cancellation, termination or change except after thirty (30) days' prior written notice to Landlord. The policies or duly executed certificates for the same (which shall evidence the insurer's waiver of subrogation) together with satisfactory evidence of the payment of the premiums thereon, shall be deposited with Landlord prior to the Commencement Date, and, upon renewals of such policies, not less than thirty (30) days prior to expiration of the term of the coverage being renewed. If Tenant fails to comply with such requirements, Landlord may, obtain such insurance and keep the same in effect, and Tenant shall pay Landlord the premium cost thereof upon demand.

    **Section 9.3   Mutual Waiver of Right of Recovery**. Each party hereto hereby waives all claims for recovery from the other party for any loss or damage to any of its property or

resulting in loss of income or losses under worker's compensation laws or benefits insured under valid and collectible insurance policies to the extent of any proceeds collected under such insurance, subject to the limitation that this waiver shall apply only when it is either permitted by or, by the use of such good faith efforts (including the payment of a reasonable additional premium), could have been so permitted by the applicable policy of insurance. The parties hereto further agree to use good faith efforts to have any and all fire, extended coverage or any and all property damage insurance which may be carried endorsed (unless contained with the policy itself) with the following (or a substantially similar) subrogation clause: "This insurance shall not be invalidated should the insured waive in writing prior to a loss any or all right of recovery against any party for loss occurring to the property described herein."

**Section 9.4    Waiver of Landlord's Liability.**  To the extent permitted by law, Landlord and Landlord's agents and employees, including, but not limited to, the managing agent(s) for the Property and all employees of said managing agent(s), shall not be liable for, and Tenant waives all claims for, damage to persons or property sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence in or upon the Premises or the Building or any part of the Property or any adjacent property or any property under the control of Landlord, including, but not limited to, claims for direct and/or consequential damage resulting from: (i) any equipment or appurtenances becoming out of repair; (ii) Landlord's failure to keep the Building or the Property in repair; (iii) injury done or occasioned by wind, water, or other natural element; (iv) any defect in or failure of plumbing, heating or air conditioning equipment, electrical wiring or installation thereof, gas, water, and steam pipes, stairs, porches, railings, walks, piers, escalators or elevators; (v) broken glass; (vi) the backing up of any sewer pipe or downspout; (vii) the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about the Building or the Property; (viii) the escape of steam or hot water; (ix) water, snow or ice being upon or coming through the roof, skylights, windows, galleries, trapdoors, stairs, walks, piers, docks or any other place upon or near the Building or the Property or otherwise; (x) the falling of any fixture, plaster, pipes, beams, ceiling, walls or other standing or hanging portions of the Building or the Premises or other improvements on the Property; and (xi) any act, omission or negligence of co-tenants or of other persons or occupants of the Building or of adjoining buildings, or of owners of adjacent or contiguous property, or of Landlord or its agents and employees. Nothing contained in this Section 9.4 shall, however, be deemed or construed as an indemnification of Landlord or its agents, servants or employees against their own negligence.

**Section 10.    Signs and Decorations.**

**Section 10.1    Exterior Signs.**  Except as set forth on **Exhibit F** attached hereto and made a part hereof, no other signs, logos, emblems, stickers, advertising placards, descriptive material, display devices, awnings, decorations, letters or other objects may be placed or maintained on the exterior of the Building or on the Property outside of the Building by Tenant without Landlord's prior written approval, which approval may be withheld in Landlord's sole and absolute discretion. Landlord agrees that Tenant shall be entitled to four (4) signage slots on the Building's marquee, located above the theater marquee on the North Avenue side of the Building. In the event that municipal approval is required for any additional exterior signs which Landlord has approved, then Landlord agrees to cooperate, at no cost to Landlord, with Tenant in

19

obtaining such municipal approval. All such additional exterior signage shall be designed, fabricated, installed and maintained by Tenant at its sole cost.

**Section 10.2  Exterior Window Treatments**.  All window coverings or window treatments and all decorations or other objects located in the Premises and visible from outside the Building other than as shown on **Exhibit F** shall be subject to the express approval of Landlord, which approval may be withheld in Landlord's sole and absolute discretion. No signs, logos, emblems, stickers, advertising placards, letters, decorations, descriptive material or display devices visible from outside the Building may be placed on, against or in the exterior windows of the Premises (meaning those windows located in the exterior walls of the Building) without Landlord's prior written approval, which approval may be withheld in Landlord's sole and absolute discretion.

**Section 10.3  Interior Signs**.  Tenant agrees that it is in Tenant's best interest as well as the best interest of the other retail occupants of the Building that all signage in or on the Premises visible from outside the Premises be compatible in design throughout the retail portions of the Building.  Therefore, Tenant agrees that all signs in or on the Premises but visible from outside the Premises (including but not limited to those on the glass of any interior windows [meaning those windows not located in the exterior walls of the Building], store front or doors of the Premises) shall be in conformity with the standards set forth in **Exhibit E** and shall be subject to the express approval of Landlord, which approval may not be unreasonably withheld.  For the purposes of this provision, signage shall include, but shall not be limited to, signs, logos, emblems, stickers, advertising placards, letters, descriptive material, display devices, window dressing, window treatments and display window backgrounds.

**Section 10.4  Decorations**.  Tenant shall not paint or decorate any part of the exterior of the Premises.  Tenant's painting or other decoration of any part of the interior of the Premises visible from the exterior thereof shall be in conformity with the provisions of **Exhibit D** and **Exhibit E** and shall be subject to Landlord's approval.

**Section 10.5  Special Provisions Applicable to Tenant**.  Notwithstanding anything contained in Sections 10.1, 10.2, 10.3 and 10.4 above, Tenant shall be permitted to retain all existing signage for the Premises (whether exterior or interior and visible from outside the Premises), including neon signs, banners, show posters, and murals which is described on **Exhibit F** attached hereto and made a part hereof.  In addition, Landlord has approved certain additional directional signage within the Building, as shown on **Exhibit F**.  All such directional signage shall be fabricated, installed and maintained at Tenant's sole cost and expense.

**Section 11.    Tenant's Further Obligations**.

**Section 11.1  Affirmative Covenants**.  Tenant shall:

**11.1.1 Performance of Obligations.**  Perform promptly all of the obligations of Tenant set forth in this Lease, including the obligation to pay when due the Rent and all other sums which by the terms of this Lease are to be paid by Tenant.

130007072v6 0912315 73489

**11.1.2 Use and Operation; Trade Name.** Continuously use and operate the Premises only for the Permitted Uses set forth in the Schedule under Tenant's Trade Name as set forth in the Schedule and no other. Tenant agrees that its obligation to continuously operate under this Section 11.1.2 go to the essence of the parties' agreement hereunder, and that any failure to perform such obligations will result in damages to Landlord that are extremely difficult and impractical to determine and for which Landlord's remedies at law will not be adequate. Accordingly, as a fair and reasonable estimate and liquidation of Landlord's damages and not a penalty, if Tenant fails to continuously operate the Premises for business in the manner required herein, Tenant shall pay Landlord in addition to all other Rent payable hereunder an amount equal to one-hundred twenty-five percent (125%) of the Base Rent then in effect prorated on a per diem basis for any period that Tenant fails to so continuously operate. Acceptance by Landlord of such liquidated damages shall not be deemed permission for Tenant to continue such violation, and shall not preclude Landlord from seeking any other remedy (other than damages) for such violation including, without limitation, termination of this Lease or Tenant's right to possession as described in Section 16. For purposes of this Lease, "continuous operation" or "continuously operate" shall apply only to Tenant's Mainstage Theatre and e.t.c. Theatre performances, and shall mean holding such performances substantially in accordance with Tenant's existing schedule which provides for daily evening performances in the Mainstage Theatre, five days per week and evening performances in the e.t.c. Theatre, except for : (i) temporary, minor changes or shut downs for not more than five percent (5%) of the total days otherwise normally scheduled for each Theatre in any one twelve calendar month period; or (ii) shutdowns due to fire or other casualties. All other hours Tenant is open for the conduct of its office, class, rehearsal, sales, film, television or other operations shall be at the discretion of Tenant and need not be uniform, consistent with those of other tenants in the Building or continuous.

**11.1.3 Intentionally omitted.**

**11.1.4 Business Hours.** Open for business and remain open to the public in accordance with Section 11.1.2 above.

**11.1.5 Clean Condition.** Keep the Premises, including without limitation the fixtures, displays, display windows and signs, and all ducts, lines, meters, mains, conduits, wires, pipes, facilities, systems and equipment installed in the Premises by Tenant or installed at Tenant's expense in any common areas with the consent of Landlord pursuant to Section 8, clean, neat and safe and in good order, repair and condition (including without limitation all necessary replacements, painting and decorating), damage by fire or other casualty covered by Landlord's insurance excepted.

**11.1.6 Mechanical Equipment.** Keep all mechanical devices in the Premises free of vibration and noise which may be transmitted beyond the Premises.

**11.1.7 Extermination.** Keep the Premises in sanitary condition, free of insects, rodents, vermin and other pests.

**11.1.8 Glass.** Keep all glass in doors, windows and elsewhere in the Premises (except for the outside surface of any glass located in the exterior walls of the Building) clean

130007072v6 0912315 73489

and in good condition and replace promptly all glass which may become damaged or broken (except for glass located in the exterior walls of the Building unless broken or damaged through the act or neglect of Tenant) with glass of the same quality, damage by fire or other casualty covered by Landlord's insurance excepted.

**11.1.9  Repair of Common Areas Damaged by Tenant.**  Promptly repair, at Tenant's sole cost and expense, any damage to the common areas or any other portion of the Property caused by the act, omission, or neglect of Tenant, its employees, agents, sublessees, concessionaires, licensees, customers or invitees.

**11.1.10  Security of Premises.**  Before leaving the Premises unattended, close and securely lock all doors or security gates or screens and otherwise secure the Premises from unauthorized entry.

**11.1.11  Rules and Regulations.**  Comply with all commercially reasonable, uniformly applied to all tenants in the Building, rules and regulations which Landlord may adopt from time to time in the management and use of the Property and for the protection and welfare of the Property and its tenants and occupants, and require such compliance by Tenant's employees and agents (provided such rules and regulations do not alter any of Tenant's rights under this Lease and are uniformly applicable to all tenants in the Building); comply with all laws, ordinances, orders and regulations and with the directions of any public officer authorized by law with respect to the Premises or the Building and the use and occupancy thereof.

**11.1.12  Conduct of Business.**  Conduct its business at all times in a businesslike and reputable manner so as to help establish and maintain a good reputation for the Building.

**11.1.13  Storage and Office Areas.**  Use such storage and office space only in connection with the business conducted by Tenant in the Premises; furnish and install all trade fixtures, which shall at all times be suitable and proper for carrying on Tenant's business.

**11.1.14  Delivery and Shipment of Goods.**  Accept delivery of and ship goods and merchandise from the Premises only in a manner and at such times and in such areas as will not materially or adversely interfere with the use of the Building by other tenants or their respective invitees and conform to all reasonable rules and regulations adopted by Landlord with respect thereto, including but not limited to security arrangements with respect to shipping and receiving areas and the transport of goods and merchandise to and from the Premises. Tenant agrees that Tenant shall be solely responsible for the security of Tenant's goods and merchandise in the Premises and elsewhere on the Property, including but not limited to all goods and merchandise in, on or about any shipping and receiving areas, in any trucks, cars or other vehicles located in such areas, or in the process of being transferred to or from such areas. Landlord, its agents and employees are not authorized to and shall not accept any responsibility for and shall not be liable for the safety or security of any of Tenant's goods or merchandise at any time wherever located.

**11.1.15  Trash.**  Store all trash and garbage within the Premises so as not to be visible to members of the public and so as not to create any health or fire hazard, such storage to

130007072v6 0912315 73489

be in odor and vermin proof containers approved by Landlord which Tenant shall maintain in a neat and clean condition. Tenant shall, at Tenant's expense, attend to the frequent disposal thereof at central collection points designated and maintained by Landlord at such times and in such manner as Landlord may direct. Landlord agrees to have such refuse at the central collection point collected and disposed of so as to maintain the Building in a clean and sanitary condition. Tenant agrees to comply with all rules and regulations adopted by Landlord in respect thereto and to move all waste being taken from the Premises directly to the trash collection area designated by Landlord. If, by reason of special disposal requirements caused by the operations of Tenant in the Premises, Landlord shall be required to provide any special disposal services or facilities, Tenant shall pay the cost thereof within ten (10) days after being billed therefor.

**11.1.16 Indemnity.** Save Landlord, its beneficiaries, mortgagees, and its agents, including the managing agent(s) for the Building and all employees of said managing agent(s), harmless and indemnified from all liability, injury, loss, cost, damage and/or expense (including reasonable attorneys' fees and expenses) in respect of any injury to, or death of, any person, and/or damage to, or loss or destruction of any property occasioned by (i) any act or omission of Tenant, Tenant's employees, sublessees, concessionaires, licensees, agents, customers, invitees or anyone claiming by, through or under Tenant; (ii) the use, occupancy, conduct, operation or management of the Premises by Tenant or any of its agents, contractors, servants, employees, licensees, suppliers, materialmen or invitees; (iii) the use of the Building, the common areas, the Property or any portion thereof, or any areas in the vicinity of the Property by Tenant or any of its customers, agents, contractors, servants, employees, licensees, suppliers, materialmen or invitees; (iv) any work or thing whatsoever done or not done on the Premises; or (v) any breach or default in performing any of the obligations under the provisions of this Lease and/or applicable law by Tenant or any of its agents, contractors, servants, employees, licensees, suppliers or materialmen during the Term; all regardless of whether such claim is asserted before or after the expiration of the Term or any earlier termination of this Lease. The foregoing covenants shall survive the expiration of the Term or earlier termination of this Lease, but shall not be deemed or construed as obligating Tenant to indemnify Landlord or its agents, servants or employees against Landlord's own negligence.

**11.1.17 Removal of Tenant's Personal Property.** Remove at the termination of this Lease, whether by lapse of time or otherwise, such of Tenant's goods and effects as are not permanently affixed to the Premises; surrender all keys to the Premises to Landlord and make known to Landlord the explanation of all combination locks remaining on the Premises; remove all of Tenant's store signs and trade fixtures; remove such of the alterations and additions made by Tenant as Landlord may request and repair any damage caused by such removal; and peaceably yield up the Premises, all alterations and additions thereto, all decorating, fixtures, furnishings, partitions, heating, ventilating, cooling and other equipment and floor coverings which are permanently affixed to the Premises (except such as Landlord has requested Tenant to remove), which shall thereupon become the property of Landlord, broom-clean and in good order, repair and condition, damage by fire or other casualty not caused by any act, omission or negligence of Tenant, its agents, employees and invitees, and reasonable wear and tear excepted. Notwithstanding the foregoing, at the expiration or earlier termination of this Lease, Landlord may not require Tenant to remove any alterations or improvements to the Premises which exist as of the date of this Lease, whether completed by Tenant or Landlord (or Landlord's predecessors), nor to remove any future alterations or improvements to the Premises

23

(whether completed by Landlord or Tenant), unless at the time Landlord approves such alteration or improvement, Landlord advises Tenant in writing that Tenant will be obligated to remove such alteration or improvement at the expiration or earlier termination of this Lease.

Any property of Tenant which Tenant is required to remove which is not removed prior to such termination shall, at Landlord's option, become the property of Landlord without further action of the parties, or Landlord may remove all or any portion of the same from the Premises and dispose of it in any manner, in which in which event Tenant shall, upon demand, pay to Landlord the actual cost of such removal and disposal and the cost of repairing any and all damage to the Premises caused by such removal.

Tenant shall be liable to Landlord for any loss, liability or expense suffered by Landlord as a result of Tenant's failure or delay in so surrendering the Premises to Landlord or the failure to leave the Premises in the condition required hereunder including, but without limitation, claims made against Landlord by any succeeding tenant as a result of such delay.

**11.1.18    Keys.**  Provide Landlord with a key to all doors, security screens or gates and any other security or alarm devices and/or systems installed by Tenant in the Premises.

**11.1.19    References to Piper's Alley.**  Tenant shall not use the name "Piper's Alley," as part of Tenant's Trade Name or otherwise except to identify the location of the Premises without the prior written consent of Landlord, which consent Landlord may withhold in Landlord's absolute discretion.

**11.1.20    Alterations of Premises.**  Prior to commencement of any work in the Premises, submit plans and specifications to Landlord and secure Landlord's prior written consent thereto in each instance, which consent may be withheld in Landlord's sole and absolute discretion in connection with any alterations to the structure, foundations, roof, base building systems, utility systems or exterior of the Building or Premises and in all other instances, Landlord's consent shall not be unreasonably withheld; provided, however, in those instances where Landlord's consent shall not be unreasonably withheld in the event such cost of work is less than $25,000.00, Tenant shall not be required to obtain Landlord's prior consent thereto; pay promptly when due the entire cost of any work in the Premises undertaken by Tenant so that the Premises and the Property shall at all times be free of liens for labor and materials; prior to commencement of any such work, Landlord shall receive assurance in the form of cash, letter of credit or bond satisfactory to Landlord, and in an amount acceptable to Landlord, that all work will be paid for; procure all necessary permits before undertaking such work; do all of such work in a good and workmanlike manner, employing materials of good quality; perform such work only with licensed, bonded, responsible contractors and subcontractors previously approved of in writing by Landlord; perform such work in such manner as to insure proper maintenance of good labor relations and to avoid labor disputes likely to cause stoppage or impairment of work, deliveries, or any other services or operations at the Building or Property; comply with all governmental requirements relating to such work; and save Landlord and its agents harmless and indemnified from all injury, loss, claims or damage to any person or property occasioned by or growing out of such work other than where due to the negligence of Landlord or its agents, servants or employees. In the event there shall be any labor stoppage or impairment as the result of any such labor dispute or potential labor dispute, Tenant shall immediately undertake such

130007072v6 0912315 73489

action as may be necessary to eliminate such dispute or potential dispute, including, but not limited to (i) removing all disputants from the job site until such time as the labor dispute no longer exists, (ii) seeking an injunction in the event of a breach of contract by Tenant and Tenant's contractors or subcontractor, and (iii) filing appropriate unfair labor practice charges in the event of a union jurisdictional dispute.

**11.1.21 Notices of Accidents.** Give Landlord prompt written notice of any accident, fire or damage occurring in or near the Premises, the Building or the common areas of the Property of which Tenant has knowledge.

**Section 11.2 Negative Covenants.** Tenant shall not:

**11.2.1 Intentionally Omitted.**

**11.2.2 Exterior of Building.** Paint, display, inscribe or affix any sign, trademark, picture, advertisement, notice, lettering or direction on any part of the outside of the Building or the Property or visible from outside the Premises except in compliance with provisions of Section 10 of this Lease.

**11.2.3 Non-Permitted Uses.** Exhibit, sell or offer for sale, use, rent or exchange in the Premises any article, thing or service except those ordinarily embraced within the Permitted Use specified in this Lease; materially alter Tenant's schedule for theatre performances within the Premises (except as expressly permitted in Section 11.1.2) without the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed, taking into account the changes, if any, in the nature and types of entertainment offered in the vicinity of the Building and changes in the nature of the business in which Tenant competes.

**11.2.4 Non-Compliance with Laws.** Make or permit any use of the Premises which, directly or indirectly, is forbidden by law, ordinance or governmental or municipal regulation or order, or which may be dangerous to life, limb or property.

**11.2.5 Improper Use of Heat and Air Conditioning.** Install or operate any refrigerating, heat or air conditioning apparatus without the prior written consent of Landlord; operate its heating or air conditioning system in such a manner as to drain heat or air conditioning from any common areas or from the premises of any other tenant or occupant of the Building.

**11.2.6 Noise.** Place any radio or television antenna or other signal receiving or transmitting device on the roof or on or in any part of the inside or outside of the Building other than the inside of the Premises and then subject to the provisions of Section 8 of this Lease; operate or permit to be operated any musical or sound producing or reproducing instrument or device inside or outside the Premises which may be heard outside the Premises; operate any device from which may emanate electrical, radio or other waves which may interfere with or impair radio, television or other signal transmission or reception from or in the Property or elsewhere.

**11.2.7 Nuisances.** Bring or permit to be in the Building any bicycle or other vehicle, dog (except in the company of a blind person) or other animal; make or permit any

130007072v6 0912315 73489

objectionable noise or odor to emanate from the Premises; do anything therein tending to create, or maintain, a nuisance; disturb, solicit or canvas any occupancy of the Building or do any act tending to injure the reputation of the Building.

      **11.2.8 Obstruction of Common Areas.**  Allow anything to remain in, place or store anything in, or obstruct in any way, any passageway, exit or stairway or any of the common areas of the Property; place any fence, structure, barricade, building, improvement, division, rail or obstruction of any type or kind on any part of the common areas; distribute or make available in the common areas any circulars, handbills, advertising materials, leaflets, coupons, merchandise, samples, gifts or other materials.  Tenant shall lend its full cooperation to keep such areas free from all obstructions and in a clean and sightly condition.  Tenant shall move all goods and merchandise, supplies, furniture and equipment as soon as received directly to the Premises, and move all such items being taken from the Premises directly to the shipping area at or about the time arranged for removal therefrom and at all times in conformity with the provisions of Section 11.1.1.4 of the Lease.  Tenant shall not overload any floors or electrical wiring; operate or permit to be placed in the Premises any coin or token operated vending machine or similar device for the sale of any goods, wares, merchandise, cigarettes or other commodities or services, including, but not limited to, pay telephones, pay lockers, pay toilets, scales or amusement devices including "pinball" machines or "video games."  Tenant shall be allowed to operate or permit to be placed in the Premises coin operated vending machines for food, beverages and candy.

      **11.2.9 Alterations by Tenant.**  Make alterations or additions in or to the Premises (including, without limitation, any alterations of the storefront or signs) except in conformity with Section 11.1.20 above.

      **11.2.10 Use of Sounds and Lights**.  Use any medium such as flashing lights, search lights, loud speakers, phonographs, sound amplifiers, radio, television or other sound receiving or reproduction equipment or light emitting devices in a manner to be seen or heard outside of the Premises.

      **11.2.11 Use of Exterior Storefront.**  Locate any fixtures, equipment, inventory, signs, placards or any advertising material outside of the storefront or store windows.

      **11.2.12 Compliance with Laws.**  Occupy or use the Premises or permit the Premises to be occupied or used for any purpose not within the Permitted Use set forth in the Schedule or any purpose, act or thing which is in violation of any public law, ordinance or governmental regulation or which may be dangerous to persons or property, or which may invalidate or increase the amount of premiums for any policy of insurance carried on the Property or covering its operation or violate the terms thereof, provided, however, that if any additional amounts of insurance premiums are caused by Tenant's occupancy or use of the Premises, Tenant shall pay to Landlord said additional amounts (it being understood that Landlord is aware of Tenant's current use of the Premises and represents that such use shall not so invalidate or increase the amount of premiums for any policy of insurance carried by Landlord).

**11.2.13 Compliance with Insurance Requirements.** Do or permit anything to be done on or in the Premises, or bring or keep anything therein or in a manner which is a violation of rules, regulations or requirements of the local fire department, the Illinois Inspection and Rating Bureau, Fire Insurance Rating Organization or any other similar authority having jurisdiction over the Building.

**11.2.14 Disturbances.** Do or permit anything to be done on or in the Premises, or sell, distribute or give away any product which in any way may in Landlord's sole judgment create a nuisance in the common areas, disturb any other tenant of the Building or the occupants of neighboring property or injure the reputation of the Building, or exhibit displays in the store windows of the Premises which, in Landlord's sole judgment, are not consistent with a first-class retail shopping center and/or the character and standards of the Building.

**11.2.15 Distress Sales.** Conduct or permit any "going-out-of-business", "lost-our-lease", bankruptcy, fire, auction or other distress sales in the Premises.

**11.2.16 Lodging.** Use the Premises for housing accommodations, for lodging or sleeping purposes or for any immoral or illegal purposes.

**11.2.17 Intentionally omitted.**

**11.2.18 Odors.** Allow any objectionable or obnoxious odor, steam, vapor, water or noise to emanate from the Premises except for nominal and customary odors emitted by a first class restaurant. If Tenant fails or refuses to prevent such emanation, Landlord may notify Tenant to correct such condition, and if Tenant shall not commence such correction within twenty-four (24) hours following the giving of such notice and adequately complete such correction within a reasonable time thereafter, Landlord may effect such correction (including, but not limited to, by requiring that Tenant cease to conduct all or a portion of Tenant's business in the Premises) without liability to Tenant for any loss or damage that may accrue to Tenant's stock in trade or business by reason thereof, and Tenant shall pay to Landlord the costs of such correction upon demand without such payment limiting or being deemed a waiver by Landlord of any other rights or remedies available to Landlord by law or under the terms of the Lease.

**11.2.19 Mechanic's Liens.** Suffer any mechanic's or other lien, charge or encumbrance to be filed against the Premises or Tenant's leasehold estate therein or any portion of the Property or any income therefrom by reason of any work, labor, services or materials performed at or furnished to the Premises by, on behalf of or for Tenant, or for anyone holding the Premises through or under Tenant. If any such lien shall at any time be filed, Tenant shall as promptly as is reasonably practical cause the same to be discharged of record by payment, bond, order of a court of competent jurisdiction or otherwise, and provide to Landlord evidence of the discharge thereof; provided, however, that if Tenant, in good faith, desires to contest any such lien, Tenant may do so if (i) such contest will operate to prevent any foreclosure by the lien claimant against the Property during the pendency of such contest and (ii) Tenant provides to Landlord a bond or other security satisfactory to Landlord in an amount equal to at least one hundred fifty percent (150%) of the total amount of such lien(s). If Tenant shall fail to cause any such lien to be discharged within thirty (30) days after the filing thereof, or if Tenant is entitled to and notifies Landlord that Tenant intends to contest the same as above provided but fails to

27

provide or maintain the security which Tenant is obligated to provide to Landlord, or if Tenant's contest is unsuccessful and Tenant fails to promptly discharge such lien, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, discharge the same by paying the amount claimed to be due or by bonding or other proceeding deemed appropriate by Landlord, and the amount so paid by Landlord and all costs and expenses, including attorneys' fees and court costs, incurred by Landlord in procuring the discharge of such lien plus interest thereon at the rate of three percent (3%) over the prime rate of interest being charged by Harris Trust and Savings Bank (or its successor) as of the date of such payment shall be due and payable by Tenant to Landlord as Additional Rent on the first day of the following month. Nothing contained in this Lease shall be construed as a consent by Landlord to subject Landlord's estate in the property to any lien or liability under the mechanic's lien law of the State of Illinois or otherwise.

**Section 12.     Rights Reserved to Landlord.**     Landlord shall have the following rights, exercisable without notice, and without liability to Tenant for damage or injury to property, persons or business (all claims for damage being hereby released), and without effecting an eviction or disturbance of Tenant's use or possession or giving rise to any claim for setoff or abatement of Rent:

> **Section 12.1   Name and Address**.  To change the name or street address of the Building or the Property, provided that Landlord shall reimburse Tenant for the reasonable cost of Tenant's expenses resulting from the change of address, not to exceed the sum of $5,000.00.

> **Section 12.2   Signs**.  To install and maintain signs on the exterior and interior of the Building.

> **Section 12.3   Keys**.  To have pass keys to the Premises.

> **Section 12.4   Reletting**.  To decorate, remodel, repair, alter or otherwise prepare the Premises for re-occupancy during the last six (6) months of the Term, if during or prior to such time Tenant vacates the Premises, or at any time after Tenant abandons the Premises.

> **Section 12.5   Access**.  Subject to the terms of this Lease, to enter the Premises at reasonable hours to make inspections or repairs, or upon 24 hours prior written notice, to exhibit the Premises to prospective tenants, purchasers or others, and to enter the Premises at any time in case of emergency.

> **Section 12.6   Heavy Objects**.  To approve (said approval not to be unreasonably withheld) the weight, size and location of safes, copiers, computers (other than personal or laptop computers) and other heavy articles in the Premises and to require all such items and other furniture and equipment to be moved in and out of the Premises and the Building only at such times as will not unreasonably deny or obstruct the access and use of other tenants, and in all events, at Tenant's sole risk and responsibility.

> **Section 12.7   Repairs and Alterations.**  At any time or times (subject to the provisions of this Lease), to decorate and to make repairs and replacements, in or to the Premises or the Building or any part thereof, to be done with as little interference with Tenant's operation as reasonably possible.

130007072v6 0912315 73489

**Section 12.8   Additions.**  To make alterations or additions to the improvements on the Property or to construct additional buildings or improvements on the Property, to be done with as little interference with Tenant's operation as is reasonably possible.

**Section 12.9   Erection of Scaffolds.**  To do or permit to be done any work in or about the exterior of the Building or the Property or any adjacent or nearby building, land, street or alley; to erect scaffolds on the exterior of the Building or in the common areas; to make such use of the exterior walls of the Building, the roof of the Building and the exterior portions of the Property as Landlord desires to add to, or subtract from, the Property, to be done with as little interference with Tenant's operations as is reasonably possible.

**Section 12.10 Exclusives.**   To grant to anyone the exclusive right to conduct any business or render any service in the Building or Property, or to the tenants and occupants thereof, provided such exclusive is not inconsistent with the requirements of Tenant's exclusive rights set forth in Section 6.1 above or does not prevent Tenant from conducting any of its operations included within the Permitted Use; provided, however, Landlord shall not grant any exclusive which prohibits Tenant's use of the Premises.

**Section 12.11 Remeasurement.**   Landlord reserves the right at any time after the Premises has been reconfigured or altered, to have the area of each floor, area or space within the Premises, or any portion thereof, measured by a licensed architect in accordance with the standards set forth in Section 1.1 of this Lease; and in the event such measurement shows any variation in the applicable area, the parties shall attempt to resolve such discrepancies. In the event the parties are unable to so resolve the discrepancy, the parties shall mutually select an independent architect, the cost of which architect shall be borne equally by the parties, to measure the Premises and the decision of such architect shall be binding. To the extent there is a change in the rentable square footage of the Premises, Landlord and Tenant shall, upon Landlord's request, amend this Lease including, without limitation, Tenant's Proportionate Share and the amount of Base Rent payable hereunder.

**Section 13.   Casualty Damage.**

**Section 13.1   Damage by Fire or Other Casualty.**  If the Premises are damaged by fire or other casualty, the damage shall promptly be repaired by Landlord at Landlord's expense to substantially the same condition as before such damage provided that (i) in no event shall Landlord be required to repair or replace Tenant's property (including, without limitation Tenant's inventory, trade fixtures and stock in trade), or any work required to be performed by Tenant pursuant to **Exhibit C**; and (ii) in no event shall Landlord be liable for interruption to Tenant's business or for damages to or the replacement or repair of Tenant's Work or any other improvements, equipment, fixtures, goods or merchandise place in the Premises by Tenant.

**Section 13.2   Right to Terminate Lease due to Casualty Damage.**  Notwithstanding anything to the contrary contained herein, in the event that: (i) the Premises are damaged by fire or other casualty, and (x) the cost of restoration of such damage is equal to or exceeds thirty-four percent (34%) or more of the cost of replacement of the entire Premises or (y) such damage occurs during the last two (2) years of the Term, or (ii) at any time during the Term the Building (other than the portion constituting the Premises) is damaged to the extent that the cost of

restoration of such damage is equal to or exceeds thirty-four percent (34%) or more of the cost of replacement of the Building, then either Landlord or Tenant may elect to terminate this Lease as of the date of such damage upon giving notice of such election to the other within ninety (90) days after the occurrence of the event causing the damage. If a party elects to so terminate this Lease, the Term hereof shall end on the date of the damage to the Premises or to the Building, and thereupon all the rights and obligations of Landlord and Tenant under this Lease shall terminate except with respect to the obligations and liabilities under this Lease then existing or contingent which arose on or prior to the date of such termination.

**Section 13.3  Commencement of Restoration**.  Unless Landlord or Tenant shall have the right to and shall elect to terminate this Lease pursuant to Section 13.2 above, then Landlord shall commence the repair and restoration of the Premises and/or the Building (subject to the limitations set forth in Section 13.1 above) within thirty (30) days after the later of: (i) the date on which Landlord receives or has made available to Landlord the proceeds of any insurance policy or policies covering such damage, or (ii) the date on which possession of the Premises is delivered to Landlord.  Such repair and restoration shall be completed with reasonable diligence, due allowance being made for delay in the completion of restoration occasioned by causes beyond Landlord's control.  In the event Landlord does not substantially complete construction of the Premises within eighteen (18) months from the date of its receipt of the applicable insurance proceeds, Tenant may terminate this Lease.

Upon completion by Landlord of its construction, repair and restoration work in and to the Premises, if any, and the surrender of possession of the Premises to Tenant, Tenant shall, at its sole cost and expense, promptly begin and thereafter diligently proceed with the other construction, repairs and replacements necessary to restore the Premises to substantially the same condition as before such damage.  Such work shall include the construction, repair and replacement of all of Tenant's Work and other improvements and fixtures in the Premises. Tenant shall reopen the Premises for business as promptly as reasonably possible thereafter.

**Section 13.4  Abatement of Rent for Untenantability**.  In the event all or any part of the Premises is rendered untenantable because of damage by fire or other casualty and such damage shall not have been due to the gross negligence of Tenant, Base Rent and Additional Rent payable by Tenant shall abate as provided in the next sentence during the period in which the Premises or any portion thereof is untenantable. Rent so abated shall be computed on a per diem basis and shall be that portion of the then current per diem Base Rent and Additional Rent for the entire Premises which the area of the part of the Premises rendered untenantable bears to the area of the entire Premises.

**Section 13.5  Insurance Proceeds**.  Any and all insurance proceeds received by Landlord with respect to or as a result of damage to the Premises shall belong to Landlord and shall be expended by Landlord for the restoration of the Premises and the Building in Landlord's sole discretion.

**Section 14.  Eminent Domain.**

**Section 14.1  Substantial Taking**.  If during the Term (i) the whole of the Premises or (ii) any part thereof so substantial as to render the remainder of the Premises impractical for the

operation of Tenant's business in the Premises, or (iii) a portion of the Property so substantial as to render the remainder of the Property impractical, in the sole judgment of Landlord, for the continued operation of the Property in the manner in which it has been operated immediately prior to such taking, shall be taken by any governmental or municipal authority or by any public utility or other entity having powers of eminent domain (or if the whole or any such part of the Premises or substantial portion of the Building or Property shall be sold to any such authority, utility or other entity by Landlord under imminent threat of the exercise of the power of eminent domain with respect thereto, and the holder of any first mortgage shall, in its sole discretion, consent to such sale), this Lease shall terminate on the date of the taking of possession of the Premises or such substantial portion of the Property by such authority, utility or other entity, and Tenant shall pay Rent up to that date.

**Section 14.2    Other Taking**.  If during the Term (i)  ten percent (10%) or more of the Premises, or (ii) a portion of the Property which is not so substantial as to render the remainder of the Property impractical, in the sole judgment of Landlord, for the continued operation of the Property in the manner in which it has been operated immediately prior to such taking, shall be taken by any governmental or municipal authority or by any public utility or other entity having powers of eminent domain (or if such part of the Premises or the Property shall be sold to any such authority, utility or other entity by Landlord under imminent threat of the exercise of the power of eminent domain with respect thereto, and the holder of any first mortgage shall, in its sole discretion, consent to such sale), this Lease shall terminate only as to the portion of the Premises so taken, if any, and Tenant shall continue to pay Rent for the entire Premises up to the day of such taking.  Thereafter, Base Rent and Additional Rent shall be equitably adjusted based on the area of the Premises taken compared to the area of the entire Premises.  In such event, Landlord shall, at its expense, within a reasonable time after the occurrence of such taking or sale, make necessary repairs and alterations to the remainder of the Premises so as to constitute a complete architectural unit and to restore the same, as nearly as practicable, to a condition substantially similar to that which existed immediately prior to such taking or sale, provided, however, that Landlord shall not be obligated to expend in connection with such repairs or alterations an amount in excess of the amount of the net award or purchase price received by Landlord for the portion so taken.

**Section 14.3    Taking During Last Two Years of Term**.  If during the last two (2) years of the Term (i) any portion of the Premises or (ii) twenty-five percent (25%) or more of the Property shall be taken by any governmental or municipal authority or by any public utility or other entity having powers of eminent domain (or any part of the Premises or such portion of the Property shall be sold to any such authority, utility or other entity by Landlord under imminent threat of the exercise of the power of eminent domain with respect thereto, and the holder of any first mortgage shall, in its sole discretion, consent to such sale), either Landlord or Tenant may elect, upon written notice to the other, to terminate this Lease as of the date of taking of possession of such portion of the Premises or the Property by such authority, utility or other entity, and Tenant shall pay Rent up to that date.

**Section 14.4    Taking of Possession**.  For the purposes of this Lease, a "taking" shall include a taking of possession for a period of time in excess of twelve (12) months.

130007072v6 0912315 73489

**Section 14.5   Notice of Pending Proceeding**.  Landlord shall use reasonable efforts to inform Tenant promptly if Landlord has knowledge of the pendency of any taking of such portion of the Premises or the Property which, if accomplished, would automatically operate to terminate this Lease or give Landlord the right to terminate the Lease, and in such event Landlord shall use reasonable efforts to keep Tenant informed about such action.

**Section 14.6   Ownership of Award**.  The entire compensation payable in connection with any taking or the proceeds of any sale, whether for the whole or any part of the Premises or the Property, shall be paid to and shall be the sole property of Landlord, whether such compensation or proceeds shall be paid as compensation for diminution in the value of the leasehold or to the fee of the Premises or otherwise, and Tenant hereby assigns to Landlord all of Tenant's right, title and interest in and to any and all such compensation.  Tenant agrees that Tenant shall not make any claim to any portion of such award; provided however, that Landlord shall not be entitled to any award made expressly to Tenant as a result of a separate action by Tenant against the condemning authority for the taking of Tenant's trade fixtures, furniture or leasehold improvements to the extent of the net cost to Tenant of said improvements, and less depreciation computed from the date of completion of said improvements to the expiration of the Main Term of this Lease, unless the amount of such award was deducted from or reduced the amount of the award to Landlord.

**Section 15.   Force Majeure.**  In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, fire or other casualty, or other reason of a similar or dissimilar nature beyond the reasonable control of the party delayed in performing work or doing acts required under the terms of this Lease, then performance of such act shall be excused for the period of the delay, and the period for the performance of any such act shall be extended for a period of the delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided that (i) delays or failures to perform resulting from lack of funds or the unavailability of a particular contractor or laborer shall not be deemed delays beyond the reasonable control of a party; (ii) the provisions of this Section shall not operate to excuse Tenant from completing construction of the Premises and opening for business in the Premises as required herein following damage where the Lease is not terminated; and (iii) the provisions of this Section shall not operate to excuse Tenant from prompt payment of Rent or any other payments required by the terms of this Lease and shall not extend the Term.  All rights and remedies herein contained and reserved to Landlord shall not be considered as exclusive of any other rights or remedies of Landlord but shall be construed as cumulative and shall be in addition to every other remedy now or hereafter existing at law, in equity or by statute.

**Section 16.   Defaults by Tenant; Landlord's Remedies.**

**Section 16.1   Tenant's Defaults.**  If (i) any voluntary or involuntary petition or similar pleading under any bankruptcy or insolvency law or statute shall be filed by or against Tenant; (ii) any voluntary or involuntary proceeding in any court or tribunal shall be instituted to declare Tenant insolvent or unable to pay its debts, or Tenant makes an assignment for the benefit of its creditors, or Tenant seeks protection against its creditors or a court supervised reorganization because it is unable to meet its obligations, or a trustee or receiver is appointed for Tenant or for

32

the major part of Tenant's property, and if such proceeding is not stayed or dismissed within sixty (60) days thereafter or Tenant is dissolved; (iii) any execution or attachment shall issue against Tenant or Tenant's business or property or against the leasehold estate created hereby; (iv) this Lease or the leasehold estate of Tenant shall pass to or devolve upon, by operation of law or otherwise, anyone other than Tenant (except as herein permitted); (v) Tenant fails to submit plans or, if required, resubmit plans as an when required or to promptly commence or thereafter diligently pursue construction of Tenant's Work or Tenant fails to continuously operate the Premises as and when required by this Lease; (vi) Tenant defaults in the prompt payment of Rent for the second time within the immediately preceding twelve (12) calendar month period and such default shall continue for ten (10) or more days after notice to Tenant; (vii) Tenant defaults in the prompt payment of Rent for a third or subsequent time within the immediately preceding twelve (12) calendar month period (no notice by Landlord to Tenant of such default being required); (viii) Tenant defaults in the performance or observance of any other provisions of this Lease (other than those relating to the payment of Rent) for the second time within the immediately preceding twelve (12) calendar month period and such other default shall continue for thirty (30) or more days after notice thereof shall have been given to Tenant, unless such default shall be of a nature that it cannot reasonably be cured within such thirty (30) day period of time, in which case Tenant shall have such additional time as is reasonably required to effect such cure, up to a maximum of one hundred twenty (120) days, provided that Tenant is diligently and continuously prosecuting such cure to completion; (ix) Tenant defaults in the performance or observance of any other provisions of this Lease (other than those relating to the payment of Rent) for a third or subsequent time within the immediately preceding twelve (12) calendar month period (no notice by Landlord to Tenant of such default being required); or (x) Tenant abandons the Premises; then, and in any such event, Landlord may, if Landlord so elects but not otherwise, and with or without notice of such election, and with or without entry or other action by Landlord, either terminate this Lease, or terminate Tenant's right to possession, without terminating this Lease.

**Section 16.2  Payment of Damages**.  Notwithstanding any other provisions of this Lease, Landlord shall, forthwith upon exercising either of the remedies set forth in Section 16.1 above, be entitled to recover from Tenant, as damages and not as a penalty, an amount equal to the then present value of the Rent reserved herein for the remainder of the stated Term, plus the anticipated expenses of reletting the Premises for such Term, less the fair rental value of the Premises for the remainder of the stated Term, exclusive of any options to renew.

For the purposes of this calculation, the fair rental value of the Premises for the remainder of the stated Term shall be determined by an independent real estate appraiser having a designation as a member of the Appraisal Institute and not less than ten (10) years active experience appraising mixed use properties in the City of Chicago similar to the Property selected by Landlord, whose determination shall be final and binding on Landlord and Tenant.

Landlord shall not be required to account to Tenant for any amounts by which the fair rental value of the Premises for the remainder of the Term exceeds the Rent due under this Lease for such period.

**Section 16.3  Repossession of Premises by Landlord**.  Upon any termination of Tenant's right to possession (regardless of whether the Lease shall be terminated), Tenant shall

130007072v6 0912315 73489

surrender possession and vacate the Premises immediately, and remove Tenant's property as provided in Section 11.1.17 and deliver possession of the Premises to Landlord. Tenant hereby grants to Landlord full and free license to enter into the Premises in such event with or without process of law, and to repossess Landlord of the Premises as of Landlord's former estate, and to expel or remove Tenant and, at Tenant's expense, any and all property therefrom, using such force as may be necessary, without being deemed in any manner guilty of trespass, eviction, forcible entry or detainer, or conversion of property, and without relinquishing Landlord's rights to Rent or any other rights given to Landlord hereunder, or by law.

**Section 16.4   Removal of Tenant's Property; Reletting.**   If Landlord elects under Section 16.1 above to terminate Tenant's right to possession only without terminating the Lease, Landlord may, at Landlord's option, enter into Premises, remove Tenant's signs and other evidence of tenancy, and take and hold possession thereof as provided in Section 16.3 above without such entry and possession terminating this Lease or releasing Tenant, in whole or in part, from Tenant's obligations to pay the Rent reserved herein and Tenant's other obligations hereunder for the full Term. Upon and after entry into possession without termination of this Lease, Landlord shall use commercially reasonable efforts to relet the Premises or any part thereof for the account of Tenant to any person, firm, or corporation other than Tenant for such rent, for such reasonable time and upon such reasonable terms as Landlord shall determine. In any such case, Landlord may in its sole discretion make reasonable repairs, alterations and additions in or to the Premises, and redecorate the same to the extent deemed by Landlord reasonably necessary or desirable, and Tenant shall, upon demand, pay the cost thereof together with Landlord's reasonable expenses of the reletting. If the consideration collected by Landlord upon any such reletting for Tenant's account is not sufficient to pay the full amount of unpaid Rent reserved herein together with the costs of reasonable repairs, alterations, additions, redecorating and Landlord's expenses (including without limitation, brokerage and fees), Tenant shall pay to Landlord the amount of such deficiency upon demand, and if the consideration so collected from any such reletting is more than sufficient to pay the full amount of the Rent together with the costs and expenses of Landlord, Landlord, at the end of the stated Term, shall retain such surplus.

**Section 16.5   Disposal of Tenant's Property.**   Any and all property of Tenant which may be removed from the Premises by Landlord pursuant to the authority of this Lease or by law may be handled, removed or stored in a commercial warehouse or otherwise by Landlord, at the risk, cost and expense of Tenant, and Landlord shall in no event be responsible for the value, preservation or safekeeping thereof. Tenant shall pay to Landlord, upon demand, any and all expenses incurred in such removal and all storage charges against such property, for so long as the same shall be in Landlord's possession or under Landlord's control. Any such property of Tenant not removed from the Premises when required or any of Tenant's property removed from the Premises by Landlord and stored which is not retaken from storage by Tenant within thirty (30) days shall be conclusively deemed to have been forever abandoned by Tenant, and Landlord may dispose of the same in such manner as Landlord shall choose, but such disposal shall not relieve Tenant of the obligation to reimburse Landlord for the cost of removal, storage and disposition of such property.

**Section 16.6   Reimbursement of Landlord's Costs.**   The non-prevailing party shall pay all of the prevailing party's costs, charges and expenses, including the fees of counsel, agents

130007072v6 0912315 73489

and others retained by the prevailing party incurred in enforcing or seeking to enforce its rights and remedies under this Lease. Tenant agrees that Landlord may, from time to time, file suit to recover any sums falling due under the terms of this Section.

**Section 16.7   Intentionally omitted.**

**Section 16.8   Holdover by Tenant**.   In the event Tenant remains in possession of the Premises after the expiration or termination of the tenancy created hereunder, and without the execution of a new lease, Tenant shall be deemed to be occupying the Premises as a tenant from month-to-month, at one and one-half (1-1/2) times the Rent and all the other charges due hereunder (**"Holdover Rent"**), and subject to all the other conditions, provisions and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy.   In addition thereto, Tenant shall be liable to Landlord for any and all damages which Landlord shall suffer by reason thereof in excess of such Holdover Rent, and Tenant will indemnify Landlord against all claims and demands made by any succeeding tenants against Landlord, founded upon delay by Landlord in delivering possession of the Premises to such succeeding tenant.

**Section 16.9   Landlord's Right to Cure Tenant's Defaults**.   Landlord may, but shall not be obligated to, cure, at any time, with notice, any default by Tenant under this Lease and may perform any other obligation of Tenant hereunder. Whenever Landlord so elects, all costs and expenses thereby incurred by Landlord, including, without limitation, attorneys' fees and court costs, together with interest on the amount of costs and expenses so incurred at a rate equivalent to three percent (3%) above the prime rate of interest in effect on the date of payment at Harris Trust and Savings Bank (or its successor), or at the maximum legal rate then in effect, whichever is lower, shall be paid by Tenant to Landlord on demand, but such action by Landlord and the payment of such sums by Tenant shall not be deemed to be a waiver by Landlord of any rights which Landlord may have under the terms of this Lease or by law by reason of such default.

**Section 16.10   Non-Waiver by Landlord**.   No consent or waiver, expressed or implied, by Landlord to or of any breach of any covenant, condition or duty of Tenant under this Lease shall be construed as a consent or waiver to or of any other breach of the same or any other covenant, condition or duty hereunder.

**Section 17.   Subletting and Assignment; Changes in Control of Tenant**

**Section 17.1   Subletting by Tenant**.   Tenant shall not sell, assign, mortgage, pledge or in any manner transfer this Lease or Tenant's rights hereunder, sublet the Premises or any part thereof, grant any license to use the Premises (including any concessions or leased departments) or allow any transfer, use or occupancy thereof by anyone other than Tenant, or permit any lien upon Tenant's interest by operation of law (collectively **"Transfer"**), without in each case obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed, but for the purposes of this Lease, occupancy of small portions of the Premises (i.e., less than 25% at any one time) by any Affiliate of Tenant shall not be deemed a Transfer. For purposes of this Lease, the term **"Affiliate"** shall mean and include any person directly or indirectly controlling, controlled by or under common control with Tenant or the existing shareholders of Tenant whether through stock, or partnership interest or membership

130007072v6 0912315 73489

interest ownership or management contracts. Notwithstanding the foregoing, Tenant is expressly prohibited from subletting the Premises or any portion thereof or assigning this Lease to existing tenants in the Building.

**Section 17.2   Landlord's Right to Recapture.**   In the event that Tenant desires to Transfer its interest in this Lease or all or a portion of the Premises for the balance or any part of the Term, Tenant shall, by notice to Landlord in writing, advise Landlord of its desire to do so and a proposed date for such Transfer (which shall not be less than ninety (90) days after the date of Tenant's notice).  Tenant's notice shall state the name and address of the proposed Transferee, and a true and complete copy of the proposed instrument documenting the Transfer, evidencing such Transferee's assumption of Tenant's obligations hereunder, shall be delivered to Landlord with said notice.  Tenant shall also provide to Landlord such financial information about the proposed Transferee as Landlord may reasonably require.  In such event, Landlord shall have the right, to be exercised by giving written notice to Tenant within thirty (30) days after receipt of Tenant's notice, to recapture the space described in Tenant's notice, and such recapture notice shall, if given, terminate this Lease with respect to the space therein described as of the proposed date of Transfer stated in Tenant's notice.  If Tenant's notice shall cover all of the Premises or Tenant's interest in this Lease and Landlord shall give the aforesaid recapture notice with respect thereto, then the Term shall expire on the date stated in Tenant's notice as fully and completely as if that date had been herein definitely fixed for the expiration of the Term.  If, however, this Lease is so terminated with respect to less than the entire Premises, the Base Rent, and Tenant's Proportionate Share shall be adjusted on the basis of the number of square feet retained by Tenant in proportion to the number of square feet contained in the Premises as described in this Lease, and this Lease as so amended shall continue thereafter in full force and effect.  In such event, Tenant shall pay all costs and expenses incurred by Landlord in moving, reconstructing or building new demising walls, etc. to separate the space so recaptured from the remainder of the Premises, and Tenant shall be solely responsible for any reconstruction, modifications or alterations to the remaining Premises necessitated thereby.

Notwithstanding Landlord's recapture of all or any portion of the Premises pursuant to this provision, Tenant shall remain fully liable for all Rent and other obligations relating to the entire Premises up to the date of such recapture.

The failure or refusal of Landlord to exercise Landlord's right of recapture pursuant to this provision shall not be deemed to require Landlord to consent to any proposed Transfer by Tenant.

**Section 17.3   Consent Not a Release of Tenant.**   Any Transfer to which Landlord consents shall not release or discharge Tenant of or from any liability, whether past, present or future, under this Lease, and Tenant shall continue to be fully liable hereunder, jointly and severally with such Transferee, including any obligations arising out of any subsequent amendments to this Lease made between Landlord and such Transferee (whether or not consented to by Tenant).  Each Transferee shall agree to comply with and be bound by all of the terms, covenants, conditions, provisions and agreements of this Lease to the extent of the space Transferred, and Tenant shall deliver to Landlord, promptly after execution, an executed copy of each such instrument of Transfer.

130007072v6 0912315 73489

**Section 17.4    Transfer Without Consent Ineffective as to Landlord.**    Any sale, assignment, mortgage, transfer, or subletting of the Premises or of this Lease which is not in compliance with the provisions of this Section 17 shall be of no effect and void as to Landlord, but shall constitute a default under this Lease by Tenant, and Landlord shall be entitled to exercise all rights and remedies given to Landlord in the event of Tenant's default as a result thereof.

**Section 17.5    Landlord's Right to Assign.**    Landlord may assign this Lease, provided that such assignee agrees to assume and to perform all of Landlord's obligations hereunder, including but not limited to the Security Deposit, and in such event the landlord named herein thereupon shall be relieved of all liability and obligations hereunder. Landlord shall also have the right to assign this Lease to any mortgagee or other lender providing financing to Landlord, but any such assignment shall not relieve Landlord of its obligations hereunder.

**Section 17.6    Change in Control of Tenant.**    If Tenant:

(i)    is a corporation, and if at any time during the Term the person or persons who own a majority of its voting shares at the time of the execution of this Lease cease to own a majority of such shares, or the control thereof is transferred by sale, assignment, pledge, bequest, inheritance, operation of law or otherwise to any other person, corporation, trust or other entity (including, but not limited to, any receiver or trustee in any federal or state bankruptcy, insolvency or other similar proceedings), or if there shall be a change in the identity of the persons managing the general affairs of Tenant, Tenant shall so notify Landlord, and Landlord may elect to treat such a transfer as a Transfer under this Lease. This Section shall not apply whenever Tenant is a corporation, the outstanding voting stock of which is listed on a recognized security exchange. For purposes of this Section, stock ownership shall be determined in accordance with the principles set forth in Section 544 of the Internal Revenue Code, and the term "**voting stock**" shall refer to shares of stock regularly entitled to vote for the election of directors of the corporation; or

(ii)    is a partnership, association or trust or otherwise not a natural person and there shall occur any change in the identity of any of the persons who are the partners, members or beneficiaries thereof Tenant shall so notify Landlord, and Landlord shall treat such transfer as a Transfer under this Lease.

The failure of Tenant to give Landlord notice of any change in Tenant as provided above shall be a default under this Lease and shall entitle Landlord to exercise any or all of the remedies given to Tenant under this Lease or by law in the event of a default hereunder.

**Section 17.7    Acceptance of Payment Not Consent.**    The acceptance by Landlord of the payment of Rent from any person or entity other than Tenant shall not be deemed to be a consent by Landlord to any assignment, sublease or other transfer of this Lease or any interest herein to such person or entity, nor shall the same be deemed to be a waiver by Landlord of any right or remedy of Landlord under this Lease.

**Section 17.8  Landlord's Costs.**  All costs incurred by Landlord in connection with any request for consent to any transfer, including costs of investigation and the reasonable fees of Landlord's attorneys, shall be paid by Tenant on demand from Landlord, regardless of whether Landlord shall give its consent to any such transfer.

**Section 18.    Quiet Enjoyment.**  Subject to the provisions of this Lease, Landlord covenants that Tenant, on paying the Rent and performing the covenants of this Lease on its part to be performed, shall and may peaceably and quietly have, hold and enjoy the Premises for the Term.

**Section 19.    Estoppel Certificate.**  Within ten (10) business days after written request by Landlord, Tenant, or Tenant's duly authorized representative having knowledge of the facts, shall deliver to Landlord a statement in writing certifying: (i) that this Lease is unmodified and in full force and effect (or if there have been modifications, the dates of such modifications, the nature of such modifications, and that the Lease as modified is in full force and effect); (ii) the dates to which the Rent and other charges have been paid; (iii) that Landlord is not in material default under any provisions of this Lease, or if in default, the nature thereof in detail; (iv) whether all work required to be performed by Landlord has been substantially completed, or if not completed, the work which remains to be completed; (v) whether Tenant is in possession of the Premises; (vi) the Rent Commencement Date and the Term of this Lease; and (vii) any other matters which Landlord may reasonably request or as may be requested by Landlord's current or prospective lenders, insurance carriers, auditors, and prospective purchasers.  Any such statement may be relied upon by any such parties.  If Tenant does not deliver such statement within such ten (10) business day period, Landlord, at Landlord's option, may also treat such failure as an event of default hereunder.

**Section 20.    Subordination.**  Provided Tenant is in receipt of an agreement which protects Tenant's possession of the Premises as long as Tenant is not in default hereunder, the rights and interest of Tenant under this Lease shall be subject and subordinate to any mortgages, trust deeds, leases of the Property as part of any sale and lease-back transaction, and any other security instruments that are now or hereafter may be placed upon the Property with the consent of Landlord and to any and all advances to be made thereunder, and to the interest thereon, and all extensions and modifications thereof, if the mortgagee or trustee named in said mortgages or trust deeds or the lessor in such leases or the holders of such security instruments or their successors and assigns shall elect to subject and subordinate the rights and interest of Tenant under this Lease to the lien thereof.  Any mortgagee or trustee or lessor or holder or their successors and assigns may elect to give the rights and interest of Tenant under this Lease priority over the lien of such instruments.  Tenant shall execute and deliver whatever instruments may be reasonably required for such purposes, and in the event Tenant fails to do so within ten (10) business days after demand from Landlord in writing, Landlord, at Landlord's option, may also treat such failure as an event of default hereunder.

**Section 21.    Attornment.**  In the event of any sale, transfer, assignment or other conveyance of all or a divided or undivided part of Landlord's interest in all or part of the Property or the Building, or in the event that any proceeding is brought for the foreclosure of any mortgage, trust deed or other security instrument or for the exercise of any power of sale under any mortgage, trust deed or other security instrument covering all or part of the Property or the Building, or in the event of any cancellation or termination of any ground or underlying lease covering all or

130007072v6 0912315 73489

part of the Property, Tenant shall, upon notice of the same to Tenant, attorn to and recognize as Landlord hereunder any purchaser, transferee, foreclosing mortgagee, trust beneficiary or secured party, purchaser at any foreclosure sale, or ground or underlying lessor (any such persona being hereinafter referred to as a "**Successor Landlord**"), who has assumed the obligations of Landlord under this Lease, and Landlord agrees that in such event, Landlord shall have no recourse against Tenant for the tendering of performance by Tenant to such party. Tenant shall, within ten (10) business days after written receipt thereof, execute and acknowledge any instrument reasonably required to evidence such attornment and recognition and shall deliver such executed document to the party requiring the same within said period, provided such instrument does not purport to alter or modify any of the rights and obligations of Tenant or Landlord under this Lease. If Tenant does not deliver such instrument within such ten (10) business day period, Landlord, at Landlord's option, may also treat such failure as an event of default hereunder. In the event of attornment, no purchaser, transferee, foreclosing mortgagee, trust beneficiary or secured party, purchaser at any foreclosure sale, or ground or underlying lessor shall be: (i) liable for any act or omission of Landlord, or subject to any offsets or defenses which Tenant might have against Landlord (prior to such party becoming Landlord under such attornment), (ii) liable for any security deposit or bound by any prepaid Rent not actually received by such party, or (iii) bound by any modification of this Lease not consented to by such party, but nothing contained herein or therein shall be deemed or construed as waiving any rights Tenant may have against any Successor Landlord if any such act or omission, or default or event giving rise to any such right of offset or defenses, continues after such Successor Landlord becomes a Successor Landlord.

**Section 22.    Notices.**

Section 22.1  **Notices to Landlord.**  In every case when, under the provisions of this Lease, it shall be necessary or desirable for Tenant to serve any notice or demand on Landlord, such notice or demand shall be in writing and shall be served by Registered or Certified Mail, return receipt requested or by a reputable nationally recognized overnight courier service addressed to Landlord as follows:

> Thomas M. Tully
> c/o Thomas M. Tully & Associates
> 33 North Dearborn Street
> Suite 2450
> Chicago, IL 60602
>
> with a copy to:
>
> Kenneth H. Denberg, Esq.
> Hinshaw & Culbertson LLP
> 222 N. LaSalle Street
> Suite 300
> Chicago, IL 60601

until otherwise directed by notice from Landlord to Tenant.

39

**Section 22.2   Notices to Tenant.**   In every case when, under the provisions of this Lease, it shall be necessary or desirable for Landlord to serve any notice or demand on Tenant, such notice or demand shall be in writing and may be sent by Registered or Certified Mail or by a reputable national recognized overnight courier service, addressed to Tenant to the Premises until otherwise directed by notice from Tenant to Landlord.

**Section 22.3   Effectiveness of Mailed Notices.**   Delivery of any such notice sent by Registered or Certified Mail shall be deemed effective three (3) days after surrender of such notice, properly addressed and with adequate postage prepaid, to the United States Postal Service or sent by such nationally recognized overnight courier service shall be deemed effective one (1) business day after deposit in such courier.

**Section 22.4   Copies of Notices to Lenders.**   If any mortgagee, trustee, lessor or the holder of any other security instruments against the Property shall, by notice in writing to Tenant, request that Tenant provide it with copies of any notices from Tenant to Landlord, no such notice or demand thereafter sent by Tenant to Landlord shall be effective as against such mortgagee, trustee, lessor or holder unless and until a copy of same shall also be sent to such party in the same manner as required for notices to Landlord.  All such copies of notices and demands shall be sent to such party at such address as such party shall from time to time designate in writing to Tenant.

**Section 23.   Landlord's Defaults; Lender's Right to Cure.**

**Section 23.1   Default Defined, Notice.**   Landlord shall in no event be charged with default in any of its obligations hereunder unless and until Landlord shall have failed to perform such obligations within thirty (30) days (or such additional time as is reasonably required to correct any such default) after written notice is received by Landlord from Tenant specifically describing such failure, it being agreed that a default which is of such a character that rectification thereof reasonably requires longer than thirty (30) days, shall be deemed cured within such period if Landlord commences the rectification thereof within such thirty (30) day period and completes the same with due diligence).

**Section 23.2   Notice to First Mortgagee.**   If the holder of the first mortgage covering the Premises shall have given written notice to Tenant of the address to which notices to such holder are to be sent, Tenant shall give such holder written notice simultaneously with any notice given to Landlord of any default of Landlord, and if Landlord fails to cure any default asserted in said notice within the time provided above, Tenant shall notify such holder in writing of the failure to cure, and said holder shall have the right, but not the obligation, within thirty (30) days after receipt of such second notice, to cure such default before Tenant may take any action by reason of such default.

**Section 24.   Execution.**

**Section 24.1   Submission of Lease.**   This Lease shall not be binding or in effect until a counterpart hereof has been executed and delivered by the parties, each to the other.

**Section 24.2   Entire Agreement.**   All negotiations, considerations, representations and understandings between Landlord and Tenant are incorporated herein. No act or omission or

40

course or prior dealing or oral statements of Landlord, its agents or their employees shall alter, change or modify any of the provisions hereof. This Lease contains the entire agreement of the parties and may not be modified except by an instrument in writing signed by both Landlord and Tenant. All prior communications from Landlord with respect to estimated charges payable by Tenant hereunder are for information only, and they are not to be construed as a representation or warranty of the actual charges which Tenant is or may be required to pay hereunder, or as binding upon Landlord in any manner whatsoever unless specifically provided to the contrary herein.

      **Section 24.3  Authority of Parties Executing the Lease.** The parties executing this Lease hereby represent and warrant that they are the duly authorized and acting representatives of Landlord and Tenant respectively and that by their execution of this Lease, it became the binding obligation of Landlord and Tenant respectively, subject to no contingencies or conditions except as specifically provided herein. If Tenant is a corporation, the parties executing this Lease on behalf of Tenant further represent and warrant that all necessary corporate action has been taken to authorize the execution of this Lease by the person executing the same on behalf of Tenant and Tenant is duly qualified to transact business in Illinois.

      **Section 24.4  Joint and Several Liability.** If two or more individuals, corporations, partnerships, trusts or other business associations or any combination thereof have executed this Lease as Tenant, their liability hereunder shall be deemed to be joint and several. If Tenant is a partnership, business association or similar entity, the partners, members or participants of which are by law subject to personal liability, the liability of each such partner, member or participant under this Lease shall be deemed to be joint and several. If Tenant is a trust, the liability hereunder shall be deemed to be the personal liability of the beneficiary or beneficiaries thereof, such liability being joint and several.

**Section 25.    Miscellaneous.**

      **Section 25.1  Receipt of Money after Termination of Lease.** No receipt of money by or on behalf of Landlord from Tenant after the termination of this Lease, the service of any notice, the commencement of any suit or entry of final judgment for possession shall reinstate, continue or extend the Term or affect any such notice, demand suit or judgment.

      This Lease shall be construed in accordance with and governed by the laws of the State of Illinois. If any provision of this Lease or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Lease or the application of such provision to such party or circumstances other than those as to which it is so determined invalid or unenforceable to any extent, shall not be affected thereby except as may be necessary to make the remaining provisions consistent with each other after the invalid or unenforceable provisions are deleted, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

      **Section 25.2  Time of the Essence.** Time is of the essence in each and every instance hereunder with respect to the covenants, undertakings and conditions to be performed hereunder.

130007072v6 0912315 73489

**Section 25.3    Captions**. The headings of Sections and subsections are for convenience only and do not define, limit or construe the contents of such Sections or Subsections. References made in this Lease to numbered Sections and Subsections shall refer to numbered sections or subsections of this Lease unless otherwise indicated.

**Section 25.4    Counterparts**. This Lease is to be executed in multiple copies, each of which shall constitute an original. In the event of a conflict between the provisions of any original lease with the provisions of any other original lease, then in such event, the provisions of Landlord's original lease will govern and control.

**Section 25.5    Brokers**. Tenant represents that it has dealt only with Landlord, and that no other broker participated in the negotiation of this Lease, submitted or showed the Premises to Tenant, or is or may be entitled to any commission in connection with this Lease by virtue of having assisted Tenant in any way in connection with this Lease. Tenant agrees to indemnify, defend, and hold Landlord harmless from and against any and all claims of any brokers claiming through Tenant for commissions in connection with this Lease, and any and all costs and expenses incurred by Landlord or Landlord's agents in defending against any such claims. As used in this paragraph, "**broker**" shall include any finders or other persons who may be entitled to a commission or fee as a result of the execution of this Lease, and "**commissions**" shall include finder's fees or other charges of any kind due or claimed to be due to any broker in connection with this Lease.

**Section 25.6    Relationship of Landlord and Tenant**. Nothing contained herein shall be deemed or construed by the parties hereto nor by any third party as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto; it being understood and agreed that neither the method of computation of Rent nor any other provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties other than the relationship of landlord and tenant. Whenever herein the singular number is used, the same shall include the plural, and the neuter gender shall include the masculine and feminine genders. Each of Landlord and Tenant agrees not to record this Lease and to execute, acknowledge and deliver, if a party shall so request, a "**Short-Form Lease**" in form and substance reasonably satisfactory to Landlord and Tenant suitable for recording.

**Section 25.7    No Personal Liability**. Tenant hereby acknowledges and expressly agrees that any liability or obligation of Landlord shall be limited to its interest in the Property, and no officer, director or shareholder of Landlord shall be individually or personally liable for any claim arising out of this Lease. Tenant further acknowledges and agrees that Landlord's agent(s), including, but not limited to, the managing agent(s) for the Building and all employees of said agent(s), shall have no personal or individual liability for any claim arising out of this Lease.

**Section 25.8    Relocation**. Landlord may, at Landlord's option, elect to relocate the Office Space to other space within the Property designated by Landlord (the "New Premises") upon compliance with the following requirements:

(a)    Landlord shall deliver to Tenant a notice (the "Relocation Notice") not less than ninety (90) days prior to the date specified by Landlord as the date for Tenant's

130007072v6  0912315  73489

occupancy of the New Premises of Landlord's election to relocate Tenant's Office Space and stating the location of the New Premises designated by Landlord. Landlord shall make a commercially reasonably attempt to accommodate the needs of Tenant with regard to the arrangement and location of the New Premises. Landlord shall include with the Relocation Notice outline plans and specifications for the work to be performed by Landlord in the New Premises, and Landlord shall use commercially reasonable efforts to relocate Tenant to New Premises which are similar in size and utility to the Office Space, provided, however, in all events the New Premises shall be adjacent to the main stage theatre. In the event Tenant decides the New Premises is unsuitable for any reason whatsoever, it may terminate this Lease by notifying the Landlord of its election to do so, in writing, within fifteen (15) days after receipt of the Relocation Notice. If Tenant elects to terminate this Lease, then this Lease will terminate on the date (the "**Termination Date**") which is the last to occur of (x) the date specified in the Relocation Notice as the estimated date for the relocation of the Office Space, or (y) the last day of the first full calendar month next following the date of Landlord's receipt of Tenant's written notice of termination under this paragraph (a). All rent and other charges payable under this Lease shall be adjusted as of the Termination Date, and the parties shall have the same rights and responsibilities under this Lease as if the Termination Date were the date set forth in this Lease as the date for the expiration of the Term.

(b)    If Tenant elects to relocate to the New Premises, Landlord shall construct within the New Premises, at Landlord's expense, improvements which are substantially similar in quality and utility to the improvements located in the Office Space on the date Landlord gives Tenant the Relocation Notice. Landlord shall pay the reasonable cost of moving Tenant's property and relocating Tenant's business from the Office Space to the New Premises, and Landlord shall use commercially reasonable efforts to relocate Tenant's property and business from the Office Space to the New Premises in a manner which minimizes the interruption of Tenant's business. Tenant shall fully cooperate with Landlord in the relocation of Tenant's business into the New Premises, and Tenant shall relocate its business to the New Premises and vacate the original Office Space within five (5) business days after Landlord notifies Tenant that the New Premises are available for Tenant's use.

(c)    If Tenant elects to relocate to the New Premises, this Lease shall automatically be amended to provide that, from and after the date Landlord completes its work in the New Premises and relocates Tenant's business to the New Premises (the "**Delivery Date**"), the term "Office Space and/or Training Stage Space " as used in this Lease shall refer to the New Premises and not to the premises originally leased to Tenant under this Lease and, except as modified in this paragraph (c), all terms, covenants and conditions of this Lease shall apply with full force and effect to the New Premises throughout the remainder of the term of this Lease as if the New Premises had originally been leased to Tenant in this Lease. Landlord shall install a new sign on the New Premises in accordance with Landlord's sign specifications for the Shopping Center. If requested by either party, the other party shall execute and deliver an amendment to this Lease consistent with this paragraph (c) confirming the location of the New Premises and such other matters related to the New Premises or this Lease as may reasonably be required by the requesting party.

**Section 25.9    Intentionally omitted.**

43

**Section 25.10 Intentionally omitted**.

**Section 25.11 Fourth Floor Kiosk**. Tenant shall have the right to operate a kiosk (the "**Kiosk**") in the location identified as the Kiosk Space on the fourth floor of the Building, more specifically shown on **Exhibit A-1**. No rent shall be due to Landlord for the use and operation of the Kiosk. The Kiosk shall be operated solely for the purpose of selling food and drinks to the public; provided, however, that in no event shall Tenant use the Kiosk to sell alcoholic beverages or any food or drink which are the subject of exclusives of other tenants in the Building existing as of the Commencement Date, as further specified in **Exhibit H**. The kiosk shall be a non-permanent structure, and shall be removed at the end of the Term of this Lease at the sole cost of Tenant.

**Section 25.12 Entrance Archways**. Landlord and Tenant acknowledge and agree that the concrete and stone archways ("**Archways**") located at the front entrance to the Premises and depicted on **Exhibit G** attached hereto and made a part hereof are the property of Landlord. Landlord shall, at its sole cost and expense, maintain and repair the Archways including, without limitation, the structure of such Archways in good condition and repair during the entire Term of this Lease, including any Extension. Tenant represents that: (a) Tenant has no knowledge of, and has not received, any notice of repair relating to the Archways; (b) Tenant has no knowledge of any violations of any ordinance, law or government mandated maintenance obligation relating to the Archways; and (c) to Tenant's knowledge, the Archways are in good condition and do not currently require any maintenance. Any violation of the foregoing representations shall require Tenant to repair and maintain the Archways at its sole cost during the Term of this Lease. Landlord shall not remove, remodel, repaint or otherwise damage or alter the Archways nor shall Landlord permit any or its agents or contractors to remove, remodel or otherwise damage or alter the Archways without the prior written consent of Tenant, which consent shall not be unreasonably withheld.

**Section 26. Successors.** This Lease shall bind and inure to the benefit of the parties hereto and their permitted heirs, executors, successors and assigns and shall also inure to benefit of those persons who may be beneficiaries from time to time of any land trust under which title to the Premises may be held.

**Section 27. Jury Waiver.** Landlord and Tenant hereby waive all right to trial by jury in any claim, action, proceeding or counterclaim by Landlord and Tenant, against each other on any matter arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, or Tenant's use or occupancy of the Premises.

**Section 28. Hazardous Materials.**

**Section 28.1 Limitations on Use**. Tenant shall not transport, use, store, maintain, generate, manufacture, handle, dispose, release or discharge any "**Hazardous Material**" (as defined below) upon or about the Property, or permit Tenant's employees, agents, contractors, invitees and other occupants of the Premises to engage in such activities upon or about the Property. However, the foregoing provisions shall not prohibit the transportation to and from, and use, storage, maintenance and handling within the Premises of substances customarily used in the business or activity expressly permitted to be undertaken in the Premises under this Lease,

130007072v6 0912315 73489

provided: (i) such substances shall be used and maintained only in such quantities as are reasonably necessary for such permitted use of the Premises and the ordinary course of Tenant's business therein, strictly in accordance with applicable law, highest prevailing standards, and the manufacturers' instructions therefor, (ii) such substances shall not be disposed of, released or discharged in or about the Property, and shall be transported to and from the Premises in compliance with all applicable laws, and as Landlord shall reasonably require, (iii) if any applicable law or Landlord's trash removal contractor requires that any such substances be disposed of separately from ordinary trash, Tenant shall make arrangements at Tenant's expense for such disposal directly with a qualified and licensed disposal company at a lawful disposal site (subject to scheduling and approval by Landlord), (iv) any remaining such substances shall be completely, properly and lawfully removed from the Property upon expiration or earlier termination of this Lease, and (v) for purposes of removal and disposal of any such substances, Tenant shall be named as the owner and generator, obtain a waste generator identification number, and execute all permit applications, manifests, waste characterization documents and any other required forms.

**Section 28.2   Notices Regarding Hazardous Material.**   Tenant shall immediately notify Landlord in writing of: (i) any enforcement, cleanup or other regulatory action taken or threatened by any governmental or regulatory authority with respect to the presence of any Hazardous Material on the Premises or the migration thereof from or to other property, (ii) any demands or claims made or threatened by any party relating to any loss or injury resulting from any Hazardous Material on the Premises, (iii) any release, discharge or nonroutine, improper or unlawful disposal or transportation of any Hazardous Material on or from the Premises or in violation of this Section 28, and (iv) any matters where Tenant is required by law to give a notice to any governmental or regulatory authority respecting any Hazardous Material on the Premises Landlord shall have the right (but not the obligation) to join and participate, as a party, in any legal proceedings or actions affecting the Premises initiated in connection with any environmental, health or safety law.  At such times as Landlord may reasonably request, Tenant shall provide Landlord with a written list, certified to be true and complete, identifying any Hazardous Material then used, stored, or maintained upon the Premises, the use and approximate quantity of each such material, a copy of any material safety data sheet ("**MSDS**") issued by the manufacturer or supplier therefor, and such other information as Landlord may reasonably require or as may be required by law.  The term "**Hazardous Material**" for purposes hereof shall mean any chemical, substance, material or waste or component thereof which is now or hereafter listed, defined or regulated as a hazardous or toxic chemical, substance, material or waste or component thereof by any federal, state or local governing or regulatory body having jurisdiction, or which would trigger any employee or community "right-to-know" requirements adopted by any such body, or for which any such body has adopted any requirements for the preparation or distribution of an MSDS.

**Section 28.3   Remediation.**   If any Hazardous Material is released, discharged or disposed of by Tenant or any other occupant of the Premises, or their employees, agents or contractors, on or about the Property in violation of the foregoing provisions, Tenant shall immediately, properly and in compliance with applicable laws clean up and remove the Hazardous Material from the Property and any other affected property and clean or replace any affected personal property (whether or not owned by Landlord), at Tenant's expense (without limiting Landlord's other remedies therefor).  Such clean up and removal work shall be subject

45

to Landlord's prior written approval (except in emergencies), and shall include, without limitation, any testing, investigation, and the preparation and implementation of any remedial action plan required by any court or governmental body having jurisdiction or reasonably required by landlord. If Landlord or any lender or governmental body arranges for any tests or studies showing that this Section 28 has been violated, Tenant shall pay for the costs of such tests. During the Term of this Lease, Landlord shall have the option to retain a consultant who will conduct an investigation to verify that no portion of the Building or Property (including the Premises) is being used for any activities involving, directly or indirectly, the use, generation, treatment, storage or disposal of any Hazardous Material. Tenant hereby grants to Landlord, its agents, employees, consultants and contractors the right to enter upon the Premises and to perform such tests on the Premises as are reasonably necessary to conduct any such investigation.

**Section 29. Termination of Previous Leases.** As of the Commencement Date, the following existing leases between Landlord and Tenant, and relating to the Premises, are hereby terminated: 1) that certain Space Lease dated August 16, 2000, as amended; and 2) that certain Retail Space Lease dated September 18, 2008, as amended.

**Section 30. Press Releases.** Landlord and Tenant agree that neither shall issue any press releases related to this Lease without the prior approval of the other party, which approval shall not be unreasonably withheld, conditioned or delayed

ALL EXHIBITS AND RIDERS ATTACHED TO THIS LEASE SHALL BE DEEMED TO BE A PART HEREOF AND ARE INCORPORATED HEREIN BY REFERENCE.

*Signature Page Follows*

130007072v6 0912315 73489

IN WITNESS WHEREOF, this instrument has been duly executed by the parties hereto, as of the date set forth on page one (1) hereof.

Landlord:

Tenant:

OLD TOWN DEVELOPMENT
ASSOCIATES, L.L.C., an Illinois
limited liability company

THE SECOND CITY, INC., an Illinois
corporation

By: _____

Name: Thomas M. Tully

Its: Interim manager

By: _____

Name: Andrew Alexander

Its: C.E.O.

47

IN WITNESS WHEREOF, this instrument has been duly executed by the parties hereto, as of the date set forth on page one (1) hereof.

Landlord:                                            Tenant:

OLD TOWN DEVELOPMENT                                 THE SECOND CITY, INC., an Illinois
ASSOCIATES, L.L.C., an Illinois                      corporation
limited liability company

By: _____                        By: _____
Name: Thomas M. Tully                                Its: _____
Its: Interim manager

47

**Exhibit A-1**

**Floor Plan**

See attached.

A-1-1

## Exhibit A-2

## Rent Calculation

THE SECOND CITY
MONTHLY LEASE SUMMARY

| MAIN LEASE | MTHLY | 22,070 | sqr feet |
|---|---|---|---|
| Year | BASE | BASE | |
| Oct 2010 to Sep 2011 | 33,865 | 18.41 | |
| Oct 2011 to Sep 2012 | 34,881 | 18.97 | |
| Oct 2012 to Sep 2013 | 35,928 | 19.53 | |

| TRAIN CTR LEASE | MTHLY | 4,835 | sqr feet |
|---|---|---|---|
| Year | BASE | BASE | |
| Oct 2010 to Sep 2011 | 6,338 | 15.73 | |
| Oct 2011 to Sep 2012 | 6,527 | 16.20 | |
| Oct 2012 to Sep 2013 | 6,725 | 16.69 | |

| BLACK ORCHID | MTHLY | 9,300 | sqr feet |
|---|---|---|---|
| Year | BASE | BASE | |
| Jan 2011 to Dec 2011 | 9,866 | 12.73 | |
| Jan 2012 to Dec 2012 | 10,160 | 13.11 | |
| Jan 2013 to Sep 2013 | 10,463 | 13.50 | |

| TONY N TINA | MTHLY | 9,041 | sqr feet |
|---|---|---|---|
| Year | BASE | BASE | |
| Oct 2011 to Sep 2013 | 9,041 | 12.00 | |
| (includes coat check of 554 sqr feet) | | | |

| MONTH | Main | Train Ctr | Black Orch | Coat Check | TNT | TOTAL | Sqr feet | per ft |
|---|---|---|---|---|---|---|---|---|
| 1-Jan-11 | $ 33,865 | $ 6,338 | $ 9,866 | $ 554 | | $ 50,623 | 36,759 | $ 16.53 |
| 1-Feb-11 | $ 33,865 | $ 6,338 | $ 9,866 | $ 554 | | $ 50,623 | 36,759 | $ 16.53 |
| 1-Mar-11 | $ 33,865 | $ 6,338 | $ 9,866 | $ 554 | | $ 50,623 | 36,759 | $ 16.53 |
| 1-Apr-11 | $ 33,865 | $ 6,338 | $ 9,866 | $ 554 | | $ 50,623 | 36,759 | $ 16.53 |
| 1-May-11 | $ 33,865 | $ 6,338 | $ 9,866 | $ 554 | | $ 50,623 | 36,759 | $ 16.53 |
| 1-Jun-11 | $ 33,865 | $ 6,338 | $ 9,866 | $ 554 | | $ 50,623 | 36,759 | $ 16.53 |
| 1-Jul-11 | $ 33,865 | $ 6,338 | $ 9,866 | $ 554 | | $ 50,623 | 36,759 | $ 16.53 |
| 1-Aug-11 | $ 33,865 | $ 6,338 | $ 9,866 | $ 554 | | $ 50,623 | 36,759 | $ 16.53 |
| 1-Sep-11 | $ 33,865 | $ 6,338 | $ 9,866 | $ 554 | | $ 50,623 | 36,759 | $ 16.53 |
| 1-Oct-11 | $ 34,881 | $ 6,527 | $ 9,866 | | $ 9,041 | $ 60,315 | 45,246 | $ 16.00 |
| 1-Nov-11 | $ 34,881 | $ 6,527 | $ 9,866 | | $ 9,041 | $ 60,315 | 45,246 | $ 16.00 |
| 1-Dec-11 | $ 34,881 | $ 6,527 | $ 9,866 | | $ 9,041 | $ 60,315 | 45,246 | $ 16.00 |
| 1-Jan-12 | $ 34,881 | $ 6,527 | $ 10,160 | | $ 9,041 | $ 60,609 | 45,246 | $ 16.07 |
| 1-Feb-12 | $ 34,881 | $ 6,527 | $ 10,160 | | $ 9,041 | $ 60,609 | 45,246 | $ 16.07 |
| 1-Mar-12 | $ 34,881 | $ 6,527 | $ 10,160 | | $ 9,041 | $ 60,609 | 45,246 | $ 16.07 |
| 1-Apr-12 | $ 34,881 | $ 6,527 | $ 10,160 | | $ 9,041 | $ 60,609 | 45,246 | $ 16.07 |
| 1-May-12 | $ 34,881 | $ 6,527 | $ 10,160 | | $ 9,041 | $ 60,609 | 45,246 | $ 16.07 |
| 1-Jun-12 | $ 34,881 | $ 6,527 | $ 10,160 | | $ 9,041 | $ 60,609 | 45,246 | $ 16.07 |
| 1-Jul-12 | $ 34,881 | $ 6,527 | $ 10,160 | | $ 9,041 | $ 60,609 | 45,246 | $ 16.07 |
| 1-Aug-12 | $ 34,881 | $ 6,527 | $ 10,160 | | $ 9,041 | $ 60,609 | 45,246 | $ 16.07 |
| 1-Sep-12 | $ 34,881 | $ 6,527 | $ 10,160 | | $ 9,041 | $ 60,609 | 45,246 | $ 16.07 |
| 1-Oct-12 | $ 35,928 | $ 6,725 | $ 10,160 | | $ 9,041 | $ 61,854 | 45,246 | $ 16.40 |
| 1-Nov-12 | $ 35,928 | $ 6,725 | $ 10,160 | | $ 9,041 | $ 61,854 | 45,246 | $ 16.40 |
| 1-Dec-12 | $ 35,928 | $ 6,725 | $ 10,160 | | $ 9,041 | $ 61,854 | 45,246 | $ 16.40 |
| 1-Jan-13 | $ 35,928 | $ 6,725 | $ 10,463 | | $ 9,041 | $ 62,157 | 45,246 | $ 16.48 |
| 1-Feb-13 | $ 35,928 | $ 6,725 | $ 10,463 | | $ 9,041 | $ 62,157 | 45,246 | $ 16.48 |
| 1-Mar-13 | $ 35,928 | $ 6,725 | $ 10,463 | | $ 9,041 | $ 62,157 | 45,246 | $ 16.48 |
| 1-Apr-13 | $ 35,928 | $ 6,725 | $ 10,463 | | $ 9,041 | $ 62,157 | 45,246 | $ 16.48 |
| 1-May-13 | $ 35,928 | $ 6,725 | $ 10,463 | | $ 9,041 | $ 62,157 | 45,246 | $ 16.48 |
| 1-Jun-13 | $ 35,928 | $ 6,725 | $ 10,463 | | $ 9,041 | $ 62,157 | 45,246 | $ 16.48 |
| 1-Jul-13 | $ 35,928 | $ 6,725 | $ 10,463 | | $ 9,041 | $ 62,157 | 45,246 | $ 16.48 |
| 1-Aug-13 | $ 35,928 | $ 6,725 | $ 10,463 | | $ 9,041 | $ 62,157 | 45,246 | $ 16.48 |
| 1-Sep-13 | $ 35,928 | $ 6,725 | $ 10,463 | | $ 9,041 | $ 62,157 | 45,246 | $ 16.48 |

130007072v6 0912315 73489

| | | | | |
|---|---|---|---|---|
| Oct 2013 to Dec 2014 | $ | 58,443 | 45,246 | $ 15.50 |
| 2015 | $ | 60,215 | 45,246 | $ 15.97 |
| 2016 | $ | 62,025 | 45,246 | $ 16.45 |
| 2017 | $ | 63,872 | 45,246 | $ 16.94 |
| 2018 | $ | 65,795 | 45,246 | $ 17.45 |
| 2019 | $ | 67,756 | 45,246 | $ 17.97 |
| 2020 | $ | 69,792 | 45,246 | $ 18.51 |
| 2021 | $ | 71,903 | 45,246 | $ 19.07 |
| 2022 | $ | 74,053 | 45,246 | $ 19.64 |
| 2023 | $ | 76,277 | 45,246 | $ 20.23 |
| 2024 | $ | 78,577 | 45,246 | $ 20.84 |
| 2025 | $ | 80,953 | 45,246 | $ 21.47 |
| **Option #1:** | | | | |
| 2026 | $ | 83,366 | 45,246 | $ 22.11 |
| 2027 | $ | 85,854 | 45,246 | $ 22.77 |
| 2028 | $ | 88,418 | 45,246 | $ 23.45 |
| 2029 | $ | 91,058 | 45,246 | $ 24.15 |
| 2030 | $ | 93,772 | 45,246 | $ 24.87 |
| **Option #2:** | | | | |
| 2031 - 2035 | | | | T.B.D. |
| **Option #3:** | | | | |
| 2036 - 2040 | | | | T.B.D. |

A-2-2

## Exhibit B-1

## Description of Landlord's Work

1.      Notwithstanding anything in this Lease to the contrary, Landlord shall, at its sole cost and expense, cause the HVAC system servicing the Tony n' Tina Space to be in working condition as of the Commencement Date.  Thereafter, all maintenance to the HVAC system of the entire Premises shall be the responsibility of Tenant, in accordance with Section 8.3 of this Lease.

2.      Landlord shall, at its sole cost and expense, repair the door and automatic handicap access, to the Building from the North Avenue entrance, to a good working condition. Such repair shall be completed by Landlord no later than June 30, 2011, subject to force majeure, provided, however, that if Tenant is unable to obtain a certificate of occupancy for the Tony n' Tina Space due solely to this door and automatic handicap access, then Landlord shall use commercially reasonable efforts to complete these repairs prior to June 30, 2011.

3.      Landlord shall, at its sole cost and expense, and according to plans provided by Tenant, install a single point connection from the Building fire panel to the Tony n' Tina Space.

4.      Landlord shall, at its sole cost and expense, extend the existing Black Iron exhaust system from the Adobo Grill space by an additional four (4) feet, in an attempt to decrease or eliminate food odors entering the Premises from the Adobo Grill space.  No additional work for this issue shall be done by Landlord, and Landlord makes no representation that such exhaust extension will completely eliminate all food odors from the Adobo Grill space.

130007072v6 0912315 73489

**Exhibit B-2**

**Description of Tenant's Work**

Tenant shall, at its sole cost and expense, furnish and install a code-compliant fire alarm system and related components in the Tony n' Tina Space. Tenant shall complete plans for such system, which plans shall show a single point connection to the existing Building fire control panel (such connection to be installed by Landlord at its cost). All plans, installation, testing and maintenance of such fire alarm system, except installation of the single point connection as stated above, shall be at Tenant's sole cost and expense.

130007072v6 0912315 73489

## Exhibit C

## Alterations to Premises

All alterations to the Premises shall be subject to the following:

### 1.    Space Heights

Exposed sprinkler, mechanical, electrical and plumbing systems may restrict clear height at various locations as determined by Landlord.  Tenant shall be responsible to field check all height dimensions in the Premises.

### 2.    Fire Protection

A sprinkler system will be installed by Landlord as specified by Landlord's architect in accordance with code requirements and recommendations of applicable rating bureaus, subject to Tenant's Work, above.  Sprinkler layout arranged in standard grid pattern allowing for approximately one head per 130 sq. ft.

All sprinkler heads have been or will be installed by Landlord at Tenant's expense, regardless of when installed.  Any change in sprinkler layout may be done only with Landlord's prior written approval, which approval may or may not be given.  Any change in sprinkler head location, if approved, will be done by Landlord at Tenant's expense.  A deposit of fifty percent (50%) of the cost of installing sprinkler heads and relocating of sprinkler heads must be paid by Tenant to Landlord concurrently with Tenant's submission of applicable plans to Landlord.  The balance shall be paid by Tenant upon Landlord's completion of the installation of such sprinkler heads.  All sums due hereunder shall be considered additional rent.

Any other fire detection/protection systems and/or equipment required by applicable codes, required by Landlord or deemed necessary or desirable by Tenant shall be furnished and installed by Tenant at Tenant's expense.  This shall include but shall not be limited to providing and maintenance of fire extinguishers.

### 3.    Interior Finishes

a.    Walls: All interior walls to be constructed by Tenant including metal studs and facing materials.  All wall facings must be painted or otherwise provided with a finished surface approved by Landlord.

b.    Ceilings: Use of suspended acoustical ceiling is recommended.  All ceiling material and design are subject to Landlord's approval.  Any ceiling areas above any cooking, food preparation or washing areas must be of fire rated material (painted with an intumescent paint) such as pyrocrete or plaster.

c.    Decorating: All painting, papering and other decoration or finishing of wall, floor or ceiling surfaces, subject to approval by Landlord.

130007072v6 0912315 73489

### 4. Utilities

a.      Electrical: 3-phase, 4-wire grounded electrical service rated at 120/208 volts with service capacity of 16 volt-amperes per square foot will be brought to electrical service rooms. Landlord will provide connection from one of such electrical service rooms to a single point of distribution, with main breaker only to the Premises as determined by Landlord. All other electrical work, including but not limited to the cost of providing and installing necessary meters, circuit breakers, lighting panels, power panels, conduits, outlet boxes, switches, outlets and wires within the Premises, all electrical fixtures, including lighting fixtures, exit lights and emergency lights and equipment and the installation thereof shall be at Tenant's expense.

b.      Plumbing: Sewer and water connection will be provided to the Premises. All plumbing serving the Premises must connect to locations designated by Landlord. The installation of any plumbing fixtures, facilities or pipes, kitchen or toilet facilities (including hot water heaters or boosters), and any and all other fixtures, equipment or installations related thereto whether required by applicable codes or desired by Tenant shall be subject to the prior written approval of Landlord, and if so approved by Landlord, shall be furnished and installed at Tenant's expense.

c.      Telephone: All telephone and telecommunications systems and work, including but not limited to installation of conduit required by the utility company or applicable codes, to be at Tenant's expense, subject to the provisions of Section 8 of the Lease.

d.      Heating, Air Conditioning, Ventilating: The installation of HVAC units with hook-ups to Tenant space will be at Landlord's expense. (No branch or horizontal trunk lines.) All other equipment, ducts and facilities and any and all electrical, plumbing or other work in connection with the installation and operation of the system to be at Tenant's expense. Any other heating, cooling, ventilating, exhaust or air handling facilities required by applicable codes or deemed necessary or desirable by Tenant shall be subject to Landlord's prior written approval and, if so approved, shall be furnished and installed at Tenant's expense.

### 5. Exterior Penetrations; Use of Approved Materials

No penetrations or punctures of the ceiling, floors, exterior walls or demising walls of the Premises are permitted without Landlord's prior written consent. All materials used must be approved by Landlord in writing in advance. All materials connected to walls, floors or ceiling must be fire rated.

### 6. Temporary Services

During construction, Landlord will make provision for temporary electric and water services for Tenant at such point and in such manner as Landlord shall determine. Tenant shall make use of such temporary services only after prior written request to Landlord, and Tenant shall reimburse Landlord for all such services used by Tenant. All such use of Landlord's temporary services shall be discontinued upon the connection of the Premises to the service supply lines and installation of Tenant's service meters.

130007072v6 0912315 73489

Temporary heat deemed necessary or desirable by Tenant or Tenant's contractors shall be provided by Tenant, subject to Landlord's prior written approval.

Landlord will not provide trash removal services. Tenant is responsible for trash removal from the Premises at all times. No dumpsters will be permitted at any time. All trash removal will be subject to such rules and regulations as Landlord may determine, including but not limited to restrictions as to trash receptacles, times of removal and use of corridors.

Tenant will be responsible for the security of the Premises during the performance of any construction and thereafter. Tenant shall take all measures deemed necessary or desirable by Tenant to secure the Premises. In no event shall Landlord be liable for any theft, loss or damage to any of Tenant's or Tenant's contractors' or subcontractors' goods, tools, supplies or equipment.

### 7. Construction Barricade

Tenant shall provide and shall maintain at all times during the course of construction a suitable temporary barricade completely enclosing the Store Front and other areas where the public may frequent. The specifications for and the design and decoration of this temporary barricade shall be designated by Landlord's architect. Maintenance of such barricade shall be the responsibility of Tenant.

### 8. Furniture, Fixtures and Equipment

Tenant shall, subject to Landlord's prior written approval, provide and install any and all furnishings, trade fixtures and equipment which Tenant deems necessary or desirable for the conduct of Tenant's business including all electrical and mechanical connections necessitated in connection therewith.

### 9. Signs

All signs shall conform to the requirements of Exhibit E.

### 10. General

a. Compliance with Lease Provisions: All of Tenant's construction shall be performed by Tenant in strict compliance with the terms and provisions of the Lease, including but not limited to the provisions of Section 11 thereof.

b. Landlord's Approvals: No approvals by Landlord shall be valid and binding upon Landlord unless and until the same shall be in writing signed by Landlord's authorized representative.

c. Use of Approved Equipment: All fixtures and equipment installed by Tenant must be U.L. approved and approved by the City of Chicago's Bureau of Fire Prevention.

d. Demolition: Any demolition work which is approved by Landlord shall be performed only during such times as Landlord may approve and subject to such restrictions as

Landlord may determine. Demolition work may only be performed between the hours of 9:00 a.m. and 2:00 p.m. Tenant to provide its own dumpsters for demolition debris.

e.     Safety: Tenant shall be solely responsible for safety on the job site and shall take necessary measures to ensure that its contractors and subcontractors exercise caution in all matters relating to safety of workers on the job site and others (including members of the public) who may come near to the job site. To that end, Tenant shall ensure that its contractors and subcontractors abide by all rules and regulations established by all public authorities having jurisdiction, including but not limited to those promulgated under the Construction Safety Act, OSHA, the Illinois Workplace Act and the Scaffold Act.

f.     Rules and Regulations: Landlord may, from time to time, in its discretion, promulgate rules and restrictions relating to the performance of work at Piper's Alley. Tenant agrees to abide and to cause its contractors and subcontractors to abide by such rules and regulations and understands that the failure to so abide by such rules and regulations may result in removal of Tenant or Tenant's contractors and subcontractors from the job site. To the extent that any such rules or regulations relate to or could be deemed to relate to job safety, neither the promulgation thereof nor the failure to promulgate any such rules or regulations by Landlord shall make Landlord liable for any damage to persons or property as a result of the performance of Tenant's Work by Tenant, its contractors or subcontractors. Tenant shall indemnify and hold Landlord harmless from and against any and all such liability as provided in Section 11.1.16 of the Lease.

g.     Job Site: Performance of any work by Tenant shall be strictly confined to the job site which shall be deemed to be the area of the Premises together with any part of the common areas which may be included, with the prior written consent of Landlord, in the area enclosed by the Construction Barricade. All work benches, bench saws, tools, equipment and construction materials must be kept within the job site; any such materials or equipment located outside of the job site shall be deemed discarded and may be disposed of by Landlord at Tenant's expense. Access to the job site for both construction personnel and building materials and equipment will be subject to such rules and regulations as Landlord may promulgate from time to time. Such rules and regulations may include restrictions as to hours of access and points of entry.

h.     Deliveries: Scheduling of delivery of materials must be arranged in advance with Landlord's on-site representatives. Landlord shall have the right to specify the times, places and methods of delivery to the Building and the movement of such materials from the designated receiving areas to the job site. Materials delivered to the Building shall be the responsibility of Tenant at all times, and Tenant shall take all measures deemed necessary or desirable by Tenant to secure the same against loss. In no event shall Landlord be responsible for any theft, loss or damage to any of Tenant's or Tenant's contractors' or subcontractors' goods, tools, supplies or equipment regardless of where located. Tenant understands and agrees that employees and agents of the Building are not authorized to and shall not accept any responsibility for the safety or security of any of Tenant's goods or materials at any time wherever located.

i.     Floor Loading: No suspended loads will be attached to the underside of the floor or ceiling surface structure without the prior written consent of Landlord, which consent may or

may not be given. No load shall be imposed upon any floor area in excess of the design live load of 100 pounds per square foot.

j.    Wall-Mounted Fixtures: No wall-mounted fixtures shall be installed except with the prior written consent of Landlord, which consent may or may not be given.

k.    Code Compliance: Tenant shall be responsible for compliance with all applicable codes and ordinances and the obtaining, at Tenant's expense, of necessary permits and authorizations.

l.    Mechanic's Liens: Tenant shall not cause any mechanic's or other lien, charge or encumbrance to be filed against the Premises or Tenant's leasehold estate therein or any portion of the Property or any income therefrom by reason of any work, labor, services or materials performed at or furnished to the Premises by, on behalf of or for Tenant, or for anyone holding the Premises through or under Tenant.  If any such lien shall at any time be filed, Tenant shall forthwith cause the same to be discharged of record as provided in Section 11.2.19 of the Lease.

130007072v6 0912315 73489

**Exhibit D**

**Tenant Design Standards**

Introduction

These criteria have been developed to assist tenants and their architects in creating a store that will augment the shopping experience that is unique to the Building.

The Building's various atrium, interior streets and Store Fronts create an exciting atmosphere from which tenants are able to develop a theme and produce a store to compliment this environment.

All Store Fronts are to be the standard Store Front designed by Landlord's architect and fabricated and installed by Landlord at the tenant's expense.

Tenants are encouraged to express their individuality through creative interior design, lighting technique, graphic signage, merchandising and window display presentations, but must comply with these Design Criteria. A licensed architect and a licensed engineer registered in the State of Illinois must be engaged by the tenant to prepare the required plans and specifications.

The tenant should strive for the following interior design qualities:

a. The interior shall be designed for the best presentation of merchandise within the store to maximize gross sales and to present an exciting display of merchandise when viewed from outside the Store Front.

b. In selecting materials, the utmost attention should be given to quality, durability and ease of maintenance.

These Design Standards form an exhibit to the Lease. In the case of any conflicts between the Lease and these Design Standards, the Lease Agreement shall control.

Tenant Coordinator:

> Mid-America Asset Management, Inc.
> Stuart Saucier, Tenant Coordination
> 230 West North Avenue
> Chicago, Illinois 60614
> Tel: (312) 337-0436

The Tenant Coordinator of the Building will serve as liaison between you and Landlord, coordinating activities for you in the following areas:

1. The Plan approval process
2. Landlord's construction
3. Tenant's construction
4. Signage

D-1

130007072v6 0912315 73489

5.     Tenant Design Standards compliance

6.     Utility connections

All correspondence with Landlord in reference to the above should be directed to Tenant Coordinator who will be assisting you.

Tenant Submission Requirements

After execution of the Lease, Landlord will provide the tenant with three (3) sets of Space Layout drawings giving technical and design information relative to the Premises. The tenant shall then engage an architect and an engineer both registered in the State of Illinois to prepare design drawings, working drawings and specifications to be submitted for Landlord's approval as provided in the Lease.

The tenant or tenant's representative must visit the job site prior to commencing construction to verify field conditions and measurements. Landlord shall not be responsible for any discrepancies between the drawings provided by Landlord and actual field dimensions.

Preliminary Submissions

Tenants are required to submit three (3) sets of Preliminary Plans as may be required in the Lease on the date indicated on the Schedule which is part of the Lease.

Approval of Preliminary Plans by Landlord must be obtained in writing before submitting Final Plans.

Preliminary Plans shall include the following:

a.     Architectural plans, including but not limited to: the design of the space, floor plans, elevations, sections, and renderings indicating material, color selections and finishes.

b.     Mechanical systems, including but not limited to the location of HVAC equipment and the distribution of air; the connections between the planned tenant system and the mechanical base systems provided by Landlord per Exhibit B-1; completed mechanical forms to be provided by Landlord.

c.     Electrical systems, including but not limited to floor and reflected ceiling plans showing outlets, types of lighting fixtures, other electrical equipment contemplated and location of panels and meters together with projected electrical loads. Completed electrical forms to be provided by Landlord.

d.     Plumbing systems, including but not limited to location and type of fixtures including plumbing layout; stub-outs for water and sanitary lines for toilet rooms.

e.     Signage (refer to Exhibit E for submission requirements).

f.     Preliminary specifications.

In addition, the tenant will provide Landlord with the name of the contractor and subcontractors who will be performing the tenant's work and information on their current insurance policies.

Each tenant is required to participate in the Affirmative Action Plan established for all of the Building's developments.

Landlord will use its best efforts to review and respond to the tenant within ten (10) days after receiving the tenant's Preliminary Plans. If these Preliminary Plans are approved, Landlord will return one (1) set of approved prints to the tenant. If the Preliminary Plans are not approved, the reasons for Landlord's refusal to approve will be presented to the tenant in writing.

If Landlord does not approve such plans, the tenant shall within seven (7) days resubmit three (3) sets of Preliminary Plans showing any revisions required by Landlord for preliminary approval.

Final Submissions

Within thirty (30) days after Landlord has approved in writing the Preliminary Plans, Tenant shall submit Final Plans, which shall include final working drawings, specifications and shop drawings for all of tenant's work as described in Exhibit C.

Four (4) sets of complete Final Plans shall be submitted consisting of the following:

a.  Key plan showing location of the Premises
b.  Floor plan at 1/4" scale (1/4" = 1'-0")
c.  Overall section at 1/4" scale
d.  Reflected ceiling plan at 1/4" scale
e.  Interior elevations of walls at 1/4" scale
f.  Full sections of types of partitions at 1/4" scale
g.  Details of special conditions encountered at 1-1/2" scale
h.  Door schedule with jamb details at 1-1/2" scale
i.  Finish and color schedule
j.  Electrical plans at 1/4" scale
k.  Fixture schedule with lamp types and panel schedule
l.  Fixture layout
m.  Shop drawings of all fixtures
n.  Signage (refer to Exhibit E for submission requirements)
o.  Mechanical plans at 1/4" scale
p.  Final mechanical forms
q.  Final electrical forms

Additional information may be required in some cases. Such Final Plans shall be certified by the tenant's architect and by the tenant's engineer.

Landlord will use its best efforts to review and respond to the tenant within ten (10) days after receiving the tenant's Final Plans. If these Final Plans are approved, Landlord will return

D-3

one (1) set of prints with approval to the tenant. If the Final Plans are not approved, the reasons for Landlord's refusal to approve will be presented to the tenant in writing.

If Landlord does not approve such plans, the tenant shall within seven (7) days resubmit four (4) sets of corrected Final Plans showing any revisions required by Landlord for final approval.

Pre-Construction Submissions

Prior to construction, the tenant shall submit those items required in of the Lease plus the following information to Landlord:

a. The date construction will commence and the estimated date of construction completion, fixturing work and the project opening date.

b. Itemized construction cost estimate (including architectural and engineering fees).

c. Evidence of the tenant's efforts to meet the goals of the Affirmative Action Program established for the Building.

Completion and Acceptance of Work

When the tenant has completed all tenant's work and prior to the tenant's opening for business, the tenant will supply Proof of Completion of tenant's work as required in the Lease. In addition, the tenant will request an inspection of the Premises by Landlord as part of the Proof of Completion.

After the inspection, Landlord will submit to the tenant a punch list of items Landlord deems to be part of tenant's work which are not yet complete.

Tenant will have seven (7) days to complete the punch list items. After the tenant has completed the punch list items and notified Landlord of its completion, Landlord will reinspect the Premises. If Landlord agrees that there are no other punch list items, then Landlord will accept in writing tenant's work. If Landlord determines that there are incomplete punch list items, this process will begin again.

All Punch List items must be completed before the tenant opens for business.

Note: Landlord has the right to correct any deficiencies in the tenant's construction which have not been finished according to the approved plans and specifications. Landlord will not begin any such work until the tenant has been furnished with a final punch list of deficient items. The Tenant then has seven (7) days to comply. If the tenant does not comply and Landlord performs such work, the tenant will reimburse Landlord for all costs incurred.

Drawings submitted for City or any other governing agency's permit approval must first have been approved by Landlord.

D-4

The Tenant Coordinator will coordinate Landlord's approval process for all store interior designs, Store Front designs, ceiling plans and signs proposed for the Premises, as well as answer questions and assist in the resolution of problems relating to the tenant's planning.

> Note: In no event is Tenant Coordinator authorized to approve any plans or consent to any deviations from Landlord approved plans or to waive compliance by the tenant with these Design Standards or any other provisions of the Lease. All such approvals, consents or waivers must be in writing signed by Landlord.

Summary of Approval/Construction Process

| | | |
|---|---|---|
| | Step 1. | Sign Lease and obtain Space Layout Drawings from Landlord. |
| Per Schedule | Step 2. | Architect prepares Preliminary Plans and submits them for Landlord's review. |
| 10 days | Step 3. | Landlord reviews Preliminary Plans and approves or disapproves them. |
| 7 days | Step 4. | If Preliminary Plans are not approved, Tenant resubmits modified Preliminary Plans and begins step 3 again. |
| | Step 5. | OBTAIN LANDLORD'S WRITTEN PRELIMINARY APPROVAL. |
| 30 days | Step 6. | Submit Final Plans for Landlord's review. |
| 10 days | Step 7. | Landlord reviews Final Plans and approves or disapproves. |
| 7 days | Step 8. | If Final Plans are not approved, Tenant resubmits modified Final Plans and begins step 7 again. |
| | Step 9. | OBTAIN LANDLORD'S WRITTEN FINAL APPROVAL. |
| | Step 10. | Obtain permits. |
| | Step 11. | Submit to Landlord: Proof of insurance, construction schedules, cost estimates, contractor's performance letter and material bonds and copies of all permits and approvals. |
| As per Schedule | Step 12. | Construction of Premises, both Landlord's and Tenant's Work. |
| | Step 13. | Completion and acceptance of Tenant's Work. |
| | Step 14. | Open for business. |

Material Controls

Materials Not Allowed

a. Simulated materials such as imitation brick, stone or wood, and wood-grained laminate.

b. Standard pegboard and pegboard fixturing systems.

c. Exposed fluorescent tubes.

d. Indoor/outdoor quality carpeting.

D-5

e.   Materials that, in Landlord's opinion, are of low quality, non-durable, and/or difficult to maintain.

f.   Any materials that would constitute a fire and/or public hazard.

Note:   All materials connected to walls, floor or ceiling must be fire rated. All the tenant's fixtures to be U.L. approved and approved by the City of Chicago's Bureau of Fire Prevention.

Ceiling Materials

Use of suspended acoustical ceiling is recommended. All ceiling material and design are subject to Landlord's approval. Any ceiling area above any cooking, food preparation or washing areas must be of fire-rated material (painted with an intumescent paint) such as pyrocrete or plaster.

Tenant Lighting Controls The following shall apply:

a.   Tenant shall provide a high level of incandescent or low voltage illumination within the "Design Control Area", which is the first 6 feet inside the Store Front.

b.   All fixtures in the Premises to be of a high standard approved by Landlord.

c.   No fluorescent illumination will be permitted within the Design Control Area.

d.   Within the Premises, if base lamps (incandescent or fluorescent) are used, the

Tenant must shield these fixtures with baffles, so designed to shield the lamps from the exterior at 5'6" eye level, unless otherwise approved by Landlord. The Landlord reserves the right to require adjustment of such baffles after installation is completed.

Tenant Layout Drawings: Minimum Information Requirements Architectural

1.   Drawings to be on uniform size paper drawn legibly to scale and detailed in conformance with good professional architectural standards. Also, clearly differentiate new work from existing work.

2.   Use Group and Type Construction of building.

3.   Incorporate appropriate title for operation of business.

4.   A key plan, printed from the mylar provided by Landlord, indicating location of the tenant space with respect to the building when multiple spaces are involved (example: suite, floor or buildings with more than one tenant).

5.   Note overall dimensions for the tenant spaces. A complete floor plan to include dimensions and the use designation for each space.

D-6

6.    Reflected ceiling plan to show electrical fixtures, mechanical diffusers, sprinkler head location, and ceiling grid layout.

7.    Show exitways, exit lights and emergency means of egress.

8.    Indicate the designed or designated occupancy for the Premises including employees.

9.    Typical wall sections which shall include height of walls, and types of materials for wall construction.

10.    Note materials used and flame spread rating for interior finish materials (rooms, corridors, stairways, etc.)

11.    Dimensions of aisle corridors, and door schedule to include the type size, fire resistance rating and door hardware.

12.    Whenever fire resistance ratings for structural elements are required provide details for construction to include all assembly design numbers from a U.L. approved testing laboratory.

13.    Tenant areas are required to be designed and equipped for use by physically handicapped and aged persons. Show how access to space for such persons is obtained and indicate all required facilities and fixtures. Indicate the manual use in design.

14.    No structural modifications or floor, ceiling or wall penetrations are allowed. Exceptions will be considered if Plans requesting such modifications include the stamp and signature of an architect and structural engineer registered in the State of Illinois. Also, plans must clearly indicate any such changes, with sufficient details, to show their impact on the structure. The Landlord reserves the right to disapprove all such changes.

Mechanical:

1.    HVAC units provided by Landlord; duct layout indicating sizes of ducts; exhaust layout and size. Only round or oval ducts are allowed.

2.    Size, CFM of diffusors and grilles used are to be indicated.

Electrical:

1.    Lighting fixture schedule.

2.    Lighting and receptacle layout.

3.    Subpanel locations, if any.

4.    Panel schedule to include ampacity, phase, voltage and number of circuits.

130007072v6 0912315 73489

5.      Complete riser diagram.

6.      Electrical legend.

Plumbing:

1.      Waste and vent riser diagram.

2.      Water riser diagram.

3.      Water service-length, size and pressure to be indicated.

4.      Sewer-length, size and cleanouts to be marked.

5.      Handicap fixtures and accessibility if required.

6.      Schematic drawings of the building drain if necessary.

Should you have any questions, please call Tenant Coordinator for additional information.

* * * * * * * * * * * * * * * * *

130007072v6  0912315  73489

**Exhibit E**

**Tenant's Sign Design Standards**

The use of signage in Piper's Alley's retail presentation is of paramount importance. Quality sign design creates both strong identification and imaginative imagery consistent with good merchandising presentation. It persuades, communicates and establishes individual images for a particular store as well as the larger environment within which the store operates. To be most effective, sign design must be developed in reference to its total environment, so as to become an integral part of the overall visual concept of Piper's Alley. Therefore the signage program for Piper's Alley has been developed and directed by the uniqueness of the project.

Key factors to consider are:

1.  Reclaimed warehouse architecture
2.  Strolling relaxed pace of the customer
3.  Specialty merchandise mix and high quality of the tenants

The sign techniques selected are:

1.  Hanging signs positioned perpendicular to the Store Front. These will be highly detailed graphic designs including the store name and images appropriate to the individual merchandise of each store.

2.  Signage on the glass Store Front

3.  Signage within the store itself.

All tenants at Piper's Alley are required to identify their premises by a hanging sign perpendicular to their Store Front. These signs may be designed by a Graphic Designer selected by the tenant. Fabricators and Installers will also be approved by Landlord. All costs incurred in the design, construction, installation and maintenance of this sign shall be the responsibility of the tenant. Sign costs including design, fabrication, installation and lighting will be a maximum of $3,650 unless otherwise authorized by the tenant.

All perpendicular signs will be lighted by 2 low voltage spots hanging from the light track in the corridor. These spots will be purchased and installed by Landlord at tenant's expense. This lighting expense is included as part of the maximum cost of the sign as indicated above.

All signage on the glass Store Front and within the store itself must be approved by Landlord.

Procedure for Perpendicular Signs:

1.  Tenant will submit its logo design to the Graphic Designer along with any ideas for representational imagery with which it identifies strongly.

E-1

2.    Within 28 days thereafter, the Graphic Designer will present to the tenant a Landlord approved sign design for the tenant's review along with cost information and a contract for the design, fabrication, installation and lighting of the sign.

3.    After the review process, the tenant will submit the signed contract and a 50% deposit to the Graphic Designer.

4.    The Fabricator will then prepare shop drawings which will be submitted to the tenant, Graphic Designer and Landlord for review.

5.    Within 28 days after approval of shop drawings, the sign will be finished and ready for installation.

6.    After the balance of the contract amount is paid by the tenant, and a Waiver of Lien from the Fabricator is submitted to Landlord, the Installer will install the sign.

Procedure for Other Signage

Submission of Drawings

All signage on the glass Store Front and within the store must be approved by Landlord and by all governmental authorities having jurisdiction by submission of design drawings and shop drawings before fabrication, assembly or installation takes place. Drawings should include all pertinent details necessary for construction and installation of the signage. Tenant must submit sign design for approval by Landlord a minimum of ninety (90) days before the proposed installation date. After Landlord's approval, sign must be fabricated and ready for installation within forty-five (45) days.

NOTE: Store signage shown on Preliminary or Final Plans submitted for reasons other than signage evaluation as described in these Standards shall not constitute approval of signage as part of Landlord's approval of such plans.

Materials

A variety of fabrication materials shall be considered, although construction must be guaranteed for a period of five (5) years against peeling, cracking, crazing, blistering, or any other degradation of surface or materials. Tenant shall be held responsible for the condition of finished surfaces, construction and operation for as long as it leases the Premises.

Materials Not Allowed

- •    Plexiglas letters
- •    Blinking, moving or flashing lights
- •    Exposed raceways, ballast boxes or transformers (except as required by code)
- •    Unaltered sans serif typefaces or signs which are difficult to read
- •    Moving, rotating, action or audible components

E-2

- • Sign manufacturer's or sign installer's names, stamps, logos or decals
- • Luminous, vacuum-formed plastic letters
- • Cloth, paper or cardboard signs, stickers or decals
- • Signs representing manufacturer's or brand names
- • Unedged or uncapped plastic letters or letters with no returns

Installation

All tenant signage must be available for inspection by Landlord before installation at the project site. Landlord has the right to reject any signage not conforming to approved drawings, regardless of the stage of completion or installation.

Tenant or its contractor must obtain all permits required by governmental authorities for sign installation.

Landlord is not responsible for any improperly installed or manufactured signs or for signs not meeting code requirements. Any such signs shall be removed and rebuilt to code specifications at the tenant's expense before being reinstalled.

Electrical Requirements

All electrical signs shall carry approval of Underwriters Laboratories on all component parts and on the complete display. Maximum brightness of signs shall be fifty (50) foot Lamberts measured one (1) foot from the source of light.

Replacement of Signs

Tenant has the right to replace any existing signs other than the hanging perpendicular one as long as the replacement signs meet the criteria contained in this document and have been previously approved in writing by Landlord.

* * * * * * * * * * * * * * * * * *

130007072v6 0912315 73489

**Exhibit F**

**Tenant's Signage**

Tenant presently has the following signage on or within the Premises and visible from outside the Building or the Premises, all of which (and any replacements therefor, as provided herein) may be retained throughout the Term of this Lease and any extensions and renewals thereof:

1.    One banner approximately 3 feet by 20 feet on the front of the Wells Street side of the Building.

2.    One performance schedule sign approximately 6 feet by 2 feet located in between the front doors of the entrance at 1616 North Wells ("Wells Street Entrance").

3.    Three glass areas near the Wells Street Entrance each approximately 10 feet by 3 feet displaying a neon "Tickets" sign and reviews, show art, placards, etc. for current and/or upcoming shows, all of which are placed on the inside of the window area, but visible from outside the Building.

4.    Two glass areas above front doors approximately 5 feet by 3 feet displaying the Second City logo on the Wells Street Entrance.

5.    Four glass areas approximately 5 feet by 2 feet forming part of the doors that provide access to the Wells Street Entrance, which are occasionally used for signage for private parties and special information, as well as city stickers, credit card information, etc.

6.    Office signage on glass door entrance to Business Theatre & Training Center on Wells Street (in between the Wells Street Entrance and the Adobe Grill space) consistent with Building signage (e.g. window mounted decal).

7.    Approximately 8 feet by 8 feet Second City mural hanging next to the e.t.c. Theatre entrance inside Piper's Alley.

8.    Approximately 3 feet by 4 feet recessed area ("Poster Case") directly next to the e.t.c. Theatre entrance for temporary display of current or upcoming production artwork.

9.    Approximately 3 feet by 6 feet glass pane above the e.t.c. Theatre entrance inside Piper's Alley for a neon logo sign.

10.   Approximately 6 feet by 6¾ feet glass doors that serve as the entrance to the e.t.c. Theatre occasionally used for posting of private party notices, class and show information, etc.

11. Two glass display boxes approximately 4 feet by 3 feet each on either side of the entrance to the Donny's Skybox Studio Theatre occasionally used for temporary display of special notices, class and show information.

12. Approximately 61/2 feet by 2 1/2 feet glass doors which serve as the entrance to the Donny's Skybox Studio Theatre occasionally used for special notices, class and show information, etc.

13. One banner approximately 2 feet by 5 1/2 feet hanging over the entrance to the Donny's Skybox Studio Theatre.

14. Approximately 2 1/2 feet by 4 1/3 feet area directly above the recessed poster case used for temporary signage consisting of reviews and show art; provided any signage placed in such area shall not interfere with the emergency light equipment or its functioning.

Approved Additional Directional Signage, per Section 10.5:



130007072v6 0912315 73489

**Exhibit G**

**Entrance Archways**



G-1

**Exhibit H**

**List of Exclusives**

*Note: provisions may be quoted verbatim; if so, references to other exhibits or sections shall be deemed to incorporate those exhibits/sections of the relevant leases or other agreements and capitalized terms shall have the respective meanings ascribed in the lease or other agreement containing the exclusive / use restriction.*

H-1